04-3886-pr
Hayden v. Paterson

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2007

(Argued: October 26, 2007                                    Decided:  January 28, 2010)

Docket No. 04-3886-pr

_____

JOSEPH HAYDEN, LUMUMBA AKINWOLE-BANDELLE, WILSON ANDINO, GINA ARIAS, WANDA
BEST-DEVEAUX, CARLOS BRISTOL, AUGUSTINE CARMONA, DAVID GALARZA, KIMALEE GARNER,
MARK GRAHAM, KERAN HOLMES, III, CHAUJUANTHEYIA LOCHARD, STEVEN MANGUAL, JAMEL
MASSEY, STEPHEN RAMON, NILDA RIVERA, MARIO ROMERO, JESSICA SANCLEMENTE, PAUL
SATTERFIELD, BARBARA SCOTT,

_Plaintiffs-Appellants_,

v.

DAVID A. PATERSON, Governor of the State of New York, JAMES A. WALSH AND DOUGLAS A.
KELLER, Co-Chairpersons of the New York State Board of Elections, BRIAN FISCHER,
Commissioner of New York State Department of Correctional Services,[1]

_Defendants-Appellees_.

_____

Before: WALKER, STRAUB, AND POOLER, _Circuit Judges_.

_____

Plaintiffs-Appellants appeal from the portions of a final order and judgment of the United

States District Court for the Southern District of New York (Lawrence M. McKenna, _Judge_)

_____

[1] The caption is amended pursuant to Federal Rule of Appellate Procedure 43(c)(2), with
Governor David A. Paterson being substituted for former Governor George Pataki.

entered on June 14 and 16, 2004, respectively, that dismissed plaintiffs' claims for relief under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the Fifteenth Amendment of the United States Constitution. Because plaintiffs do not state a plausible claim of intentional discrimination and they do not state a plausible claim that New York Election Law § 5-106(2) violates the Equal Protection Clause of the Fourteenth Amendment, we affirm the District Court's grant of judgment on the pleadings to defendants. We do, however, remand to the District Court to allow plaintiffs to seek leave to amend their deficient complaint as to their intentional discrimination claim. AFFIRMED and REMANDED for further proceedings consistent with this opinion.

> JUAN CARTAGENA (Risa Kaufman, Craig Acorn, Paul Keefe, *on the brief*), Community Service Society of New York, New York, NY; Theodore M. Shaw, John Payton, Norman J. Chachkin, Janai S. Nelson, Jenigh J. Garrett, Ryan P. Haygood, Debo P. Adegbile, Alaina C. Beverly, Kristen Clarke, NAACP Legal Defense and Educational Fund, Inc., New York, NY, *on the brief*; Joan P. Gibbs, Esmeralda Simmons, Center for Law and Social Justice at Medgar Evers College, Brooklyn, NY, *on the brief*; *for Plaintiffs-Appellants*.

> BENJAMIN N. GUTMAN, Assistant Solicitor General (Andrew M. Cuomo, Attorney General, Michelle Aronowitz, Deputy Solicitor General, *on the brief*), State of New York, New York, NY, *for Defendants-Appellees*.

_____

STRAUB, *Circuit Judge*:

Plaintiffs-Appellants appeal from the portions of a final order and judgment of the United States District Court for the Southern District of New York (Lawrence M. McKenna, *Judge*) entered on June 14 and 16, 2004, respectively, that dismissed plaintiffs' claims for relief under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the

Fifteenth Amendment of the United States Constitution, and section 2 of the Voting Rights Act of 1965, codified at 42 U.S.C. § 1973, *et seq.* ("VRA"). Our court, sitting *en banc*, previously resolved plaintiffs' appeal under the VRA, *see Hayden v. Pataki*, 449 F.3d 305 (2d Cir. 2006) (en banc) ("*Hayden I*"), by affirming the District Court's grant of judgment on the pleadings to defendants-appellees as to that claim. When we decided *Hayden I*, we noted that plaintiffs' constitutional claims were not before the *en banc* court and that a decision on those claims would be made by a three-judge panel in the normal course. *Id.* at 309 n.2. It is these remaining constitutional claims that we now address.

On appeal, plaintiffs raise two arguments. First, they argue that the District Court erred in dismissing their claim that, based on the discriminatory intent of prior constitutional convention delegates, New York's current felon disenfranchisement laws violate the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment. More specifically, plaintiffs contend that racial animus motivated the adoption of New York's several constitutional felon disenfranchisement provisions in the 1800s and that this animus remains legally operative today. Plaintiffs' second argument is that the District Court erred in dismissing their claim that New York Election Law § 5-106(2) violates the Equal Protection Clause of the Fourteenth Amendment because it disenfranchises, without justification, only those persons with felony convictions who are incarcerated or on parole, but not persons receiving other sentences for felony convictions.

With respect to plaintiffs' first claim, we conclude that plaintiffs fail to state a plausible claim of intentional discrimination. With respect to plaintiffs' second claim, we conclude that

New York's disenfranchisement statute does not distinguish among felons in an unconstitutional manner. We therefore affirm the District Court's grant of judgment on the pleadings to defendants. We do, however, remand to the District Court to allow plaintiffs to seek leave to amend their deficient complaint as to their intentional discrimination claim.

## BACKGROUND

**I.      Procedural Background**

This case was originally filed *pro se* by plaintiff Joseph Hayden on November 9, 2000, in the Southern District of New York. On January 15, 2003, Hayden moved through counsel for leave to file an amended complaint for declaratory and injunctive relief. On March 18, 2003, plaintiffs filed an amended complaint challenging the validity of (1) New York State's constitutional provision that requires the legislature to enact felon disenfranchisement laws; and (2) New York Election Law § 5-106(2), which disenfranchises convicted felons who are incarcerated or on parole. Specifically, plaintiffs alleged that these enactments violate their rights under the VRA; the United States Constitution, specifically the First, Fourteenth, and Fifteenth Amendments; the Civil Rights Acts of 1957 and 1960; and customary international law. Defendants filed an answer to plaintiffs' complaint on April 15, 2003.

A discovery schedule was established on May 21, 2003, with initial disclosures due on July 9, 2003. Before discovery commenced, defendants filed a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c). Plaintiffs filed their opposition on September 9, 2003. On June 14, 2004, the District Court issued a memorandum and order granting the defendants' motion for judgment on the pleadings, and dismissing all of plaintiffs'

claims. *Hayden v. Pataki*, No. 00-cv-8586, 2004 WL 1335921 (S.D.N.Y. June 14, 2004). The District Court entered judgment on behalf of defendants on June 16, 2004.

In its decision, the District Court dismissed plaintiffs' claim under section 2 of the VRA in light of our decision in *Muntaqim v. Coombe*, 366 F.3d 102 (2d Cir. 2004). *Hayden*, 2004 WL 1335921, at *5. Soon thereafter, our Court, *nostra sponte*, ordered an *en banc* consideration of plaintiffs' VRA claim and affirmed the District Court's decision by holding that the VRA does not apply to prisoner disenfranchisement laws. *Hayden I*, 449 F.3d at 329, 370. Thus, this issue has been resolved, and is no longer before us.

The District Court's memorandum and order of June 14, 2004, also decided the remaining issues in favor of defendants. In granting defendants' motion for judgment on the pleadings, the District Court held that plaintiffs had not alleged facts sufficient to state claims against defendants under the Fourteenth and Fifteenth Amendments. Specifically, the District Court found that plaintiffs' factual allegations were not sufficient to support a finding that New York's constitutional provision requiring the legislature to disenfranchise felons was passed with discriminatory intent. *Hayden*, 2004 WL 1335921, at *4. The District Court also found that New York's non-uniform legislative practice of disenfranchising only those felons sentenced to incarceration or serving parole "is entirely rational." *Id.* Accordingly, the District Court held that neither New York's constitutional provision nor its felon disenfranchisement statute violates the Equal Protection Clause of the Fourteenth Amendment or the Fifteenth Amendment. *Id.* at *5.

Plaintiffs now appeal the District Court's grant of judgment on the pleadings, arguing that

the District Court erred in finding that they failed to allege sufficient facts to support their intentional discrimination and equal protection claims. Plaintiffs have abandoned the claims they brought before the District Court under the Due Process Clause of the Fourteenth Amendment, the First Amendment, federal civil rights statutes, and customary international law.

**II.    New York's Felon Disenfranchisement Laws**

The New York State Constitution requires the legislature to "enact laws excluding from the right of suffrage all persons convicted of bribery or of any infamous crime." N.Y. CONST. art. II, § 3. New York statutory law prohibits convicted felons from voting while they are serving a prison sentence or while they are on parole following a prison sentence. N.Y. ELEC. LAW § 5-106(2). New York law, however, does allow felons to vote if they have completed their sentences, received suspended sentences, or never been sentenced to a term of imprisonment. *Id.* § 5-106(2), (5). Thus, a felon in New York is disenfranchised only until his "maximum sentence of imprisonment has expired" or "he has been discharged from parole." *Id.* § 5-106(2).

New York State's constitutional requirement of felon disenfranchisement dates back to the early nineteenth century. The Constitution of 1821 provided that "[l]aws *may* be passed excluding from the right of suffrage persons who have been, or may be, convicted of infamous crimes." N.Y. CONST. of 1821, art. II, § 2 (emphasis added), *reprinted in* 1 Charles Z. Lincoln, *The Constitutional History of New York* 199 (The Lawyers Coop. Publ'g Co. 1906) (hereinafter *Constitutional History of N.Y.*). Similar language was included in the Constitution of 1846, except that the crimes of bribery and larceny were specified, along with convictions for "any infamous crime." *See* 1 *Constitutional History of N.Y.*, *supra*, at 233. An amendment adopted

6

in 1874 required the legislature to disenfranchise felons at the next session, but stated that thereafter the provision would revert to being permissive rather than mandatory. *See* 1 *id.* at 296-97.[2] The Constitution of 1894, however, adopted the mandatory language, making it permanent. *See* 1 *id.* at 332. This same language, stating that "[t]he legislature *shall* enact laws excluding from the right of suffrage all persons convicted of bribery or of any infamous crime," was moved to a different section in the Constitution of 1938 and continues to be in force to the present. *See id.*; N.Y. CONST. art. II, § 3 (emphasis added), Credits and Historical Notes. Thus, through Article II, § 3 of the New York State Constitution, the state legislature is required to enact laws disenfranchising felons.

The current prisoner disenfranchisement statute is New York Election Law § 5-106. The statute provides in relevant part:

> No person who has been convicted of a felony pursuant to the laws of this state, shall have the right to register for or vote at any election unless he shall have been pardoned or restored to the rights of citizenship by the governor, or his maximum sentence of imprisonment has expired, or he has been discharged from parole. The governor, however, may attach as a condition to any such pardon that any such person shall not have the right of suffrage until it shall have been separately restored to him.

N.Y. ELEC. LAW § 5-106(2).[3] Like the constitutional requirement that felons be disenfranchised,

---

[2] The 1874 amendment provided in relevant part: "The legislature, at the session thereof next after the adoption of this section, shall, and from time to time thereafter may, enact laws excluding from the right of suffrage all persons convicted of bribery or of any infamous crime." 1 *Constitutional History of N.Y.*, *supra*, at 296-97.

[3] The statute further provides that the provision of § 5-106(2) "shall not apply if the person so convicted is not sentenced to either death or imprisonment, or if the execution of a sentence of imprisonment is suspended." N.Y. ELEC. LAW § 5-106(5).

7

the felon disenfranchisement statute also has roots in the nineteenth century. *See* Ch. VI, tit. I, § 3, 1829 Rev. Stat. of N.Y., vol. 1 at 127; Act of April 5, 1842, ch. 130, § 3, 1842 N.Y. Laws 109. The felon disenfranchisement statute was briefly repealed in 1896, *see* Act of May 27, 1896, ch. 909, § 168, 1896 N.Y. Laws 893, 978, but then reenacted five years later, *see* Act of May 3, 1901, ch. 654, § 2, 1901 N.Y. Laws 1668, 1669. The law has continued to be in force, albeit subject to various amendments, since 1901. The most significant statutory change came in the early 1970s. Until that time the statute had disenfranchised *all* persons convicted of a felony, even those who had served their sentence or were not sentenced to a term of imprisonment. In 1971 and 1973, however, the legislature enacted laws amending the statute to its present scheme. Since then, felons have their voting rights restored if they: (i) are not sentenced to prison; (ii) have their prison sentence suspended; (iii) have completed their maximum prison sentence; or (iv) have been discharged from parole. *See* Act of May 25, 1971, ch. 310, § 1, 1971 N.Y. Laws 952, 952-53; Act of June 11, 1973, ch. 679, § 1, 1973 N.Y. Laws 1287, 1287-88.

III.    **Plaintiffs' Allegations of Discrimination as Stated in Their Amended Complaint**

     *A.    Alleged History of Racial Discrimination in New York's Disenfranchisement Laws*

Plaintiffs' amended complaint asserts that there is a history of race discrimination in New York State's disenfranchisement laws, that there is disparate application of New York State Election Law § 5-106(2), and that racial disparities exist in the disenfranchisement rates of Blacks and Latinos. Based on these allegations, plaintiffs contend that New York's constitutional provision mandating felon disenfranchisement was enacted with the intent to discriminate against persons on account of their race in violation of the Equal Protection Clause

8

of the Fourteenth Amendment and the Fifteenth Amendment. Plaintiffs further argue that New York's felon disenfranchisement scheme violates equal protection guarantees because it distinguishes among felons in an unconstitutional manner by denying the right to vote only to those felons sentenced to incarceration or serving parole and not to those who have their prison sentence suspended or who are sentenced to probation.

Specifically, plaintiffs' amended complaint makes the following relevant allegations.[4] New York has historically used a wide variety of mechanisms to discriminate against minority voters. "Throughout the New York Constitutional Conventions addressing the right of suffrage, the framers made explicit statements of intent to discriminate against minority voters." "Delegates created certain voting requirements that expressly applied only to racial minorities and crafted other provisions with seemingly neutral language that they knew would have a discriminatory effect on racial minorities. The disenfranchisement of felons was one aspect of this effort to deprive minorities of the right to vote." For example, plaintiffs' complaint alleges that in 1777, the framers initially excluded minorities "by limiting suffrage to property holders and free men," but then as more Blacks became property holders and freemen, the legislature removed all property restrictions and instead expressly excluded Blacks from participating in the 1801 election of constitutional delegates.

---

[4] We describe the allegations in plaintiffs' amended complaint in great detail because "[i]n deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party," *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999), unless the allegations are "supported by mere conclusory statements," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Furthermore, "[a]t the second New York Constitutional Convention in 1821, the delegates met to address the issue of suffrage generally and Black suffrage in particular"; the conversation "sparked heated discussions, during which many delegates expressed the view that racial minorities were essentially unequipped to participate in civil society," and "[s]ome delegates made explicit statements regarding Blacks' natural inferiority and unfitness for suffrage." J.A. 107, ¶ 46; *see also* Nathaniel H. Carter, William L. Stone & Marcus T. C. Gould, *Reports of the Proceedings and Debates of the Convention of 1821*, 198 (Albany, E. & E. Hosford 1821) (hereinafter "*Debates of 1821*").[5] For example, one delegate to the 1821 convention instructed his colleagues to "[l]ook to your jails and penitentiaries. By whom are they filled? By the very race, whom it is now proposed to cloth [sic] with the power of deciding upon your political rights." *Debates of 1821*, *supra*, at 191. Another delegate urged his fellow delegates to "[s]urvey your prisons—your alms-houses—your bridewells and your penitentiaries, and what a darkening host meets your eye! More than one-third of the convicts and felons which those walls enclose, are of your sable population." *Id.* at 199. Another argued that the "right of suffrage" should be "extended to White men only." *Id.* at 180.

"Based on their belief in Blacks' unfitness for democratic participation, the delegates designed new voting requirements aimed at stripping Black citizens of their previously held right

---

[5] Additional allegations, and support for allegations in the amended complaint, were provided by plaintiffs to the District Court in response to defendants' motion for judgment on the pleadings "in order to provide additional context for their . . . allegations of intentional discrimination and to offer a sample of the evidence that exists to support such claims." In drawing all reasonable inferences in favor of plaintiffs, we include this context in our recitation of the facts.

10

to vote." "Article II of the Constitution of 1821 incorporated the new discriminatory restrictions and contained new and unusually high property requirements that expressly applied only to men of color. N.Y. CONST. art. II, § 1 (repealed 1870). Only [a tiny percentage of the total] Black population met these requirements. Article II also provided new citizenship requirements that applied only to men of color. *Id.*" As one delegate to the 1821 Constitutional Convention explained, while the new property qualification "did not directly restrict the right to vote to the 'White' male, as some had desired, nevertheless, the same result was accomplished by inserting property qualifications . . . that were not required for the White man." N.Y. State Constitutional Convention Comm., *Problems Relating to Home Rule and Local Government*, 143 & n.13 (J.B. Lyon Co. 1938). "Article II further restricted the suffrage of minorities by permitting the state legislature to disenfranchise persons 'who have been, or may be, convicted of infamous crimes.' N.Y. CONST. art. II, § 2. Through common law and legislative interpretation, 'infamous crimes' came to mean traditional felonies." In 1826, an amendment to the New York Constitution abolished all property qualifications for White male suffrage, but left intact the unduly onerous property requirements for Black males.

In 1846, at the third Constitutional Convention of New York, "heated debates over suffrage again focused on Blacks. Advocating for the denial of equal suffrage, delegates continued to make explicit statements regarding Blacks' unfitness for suffrage, including a declaration that the proportion of 'infamous crime' in the minority population was more than thirteen times that in the White population." J.A. 107, ¶ 51; *see also* William G. Bishop & William H. Attree, *Report of the Debates and Proceedings of the Convention for the Revision of*

11

*the Constitution of the State of New York*, 1028-29 (Evening Atlas 1846) (hereinafter "*Debates of 1846*") (substantiating claim that delegates understood that Blacks were thirteen times more likely to commit "infamous crimes" than Whites). "Felon disenfranchisement was further solidified in the Convention of 1846. As amended, the relevant constitutional provision stated: 'Laws may be passed excluding from the right of suffrage all persons who have been or may be convicted of bribery, of larceny, or of *any infamous crime . . . .*' N.Y. CONST. art. II, § 2 (amended 1894) (emphasis added)." "When re-enacting the felon disenfranchisement provision and specifically including 'any infamous crime' in the category of convictions that would disqualify voters, the delegates were acutely aware that these restrictions would have a discriminatory impact on Blacks." At the 1866-1867 fourth Constitutional Convention of New York, "after engaging in heated debates," legislators "rejected various proposals to expand suffrage and instead chose to maintain racially discriminatory property qualifications."

New York's explicit racially discriminatory suffrage requirements were in place until voided by the adoption of the Fifteenth Amendment to the United States Constitution in 1870. Under § 1 of the Fifteenth Amendment, "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. CONST. amend. XV, § 1. "[T]wo years after the passage of the Fifteenth Amendment, an unprecedented committee convened and amended the disenfranchisement provision of the New York Constitution to require the state legislature, at its following session, to enact laws excluding persons convicted of infamous crimes from the right to vote. N.Y. CONST. art. II, § 2 (amended 1894). Theretofore, the enactment of such laws was

12

permissive."[6]

Unlike the allegations just described, plaintiffs' complaint includes no specific factual allegations of discriminatory intent that post-date 1874. For example, with regard to the present constitutional provision that remains in force today and that was enacted in 1894, plaintiffs simply state that "[i]n 1894, at the Constitutional Convention following the [1874 New York constitutional amendment], the delegates permanently abandoned the permissive language and adopted a constitutional requirement that the legislature enact disenfranchisement laws." Plaintiffs further allege that this is the constitutional provision "pursuant to which § 5-106 of the New York State Election Law was enacted and under which persons incarcerated and on parole for felony convictions are presently disenfranchised in New York State." As is apparent from this quoted language, plaintiffs' amended complaint does not allege any facts as to discriminatory intent behind the delegates' adoption of the 1894 constitutional provision, which is still in effect today. Nor do plaintiffs make any non-conclusory factual allegations of discriminatory intent with respect to the enactment of, and subsequent amendments to, New York's felon disenfranchisement *statute*.

### B. *Alleged Racial Disparities in Disenfranchisement Rates of Blacks and Latinos*

In addition to claiming that New York's laws were enacted with discriminatory intent, plaintiffs allege that New York's laws are unconstitutional in that they currently have a disparate

___

[6] Furthermore, during Reconstruction, plaintiffs note additional measures that were taken that allegedly reveal the racial motivation of the state actors with regard to voting; for example, after initially ratifying the Fifteenth Amendment, New York withdrew its ratification. CONG. GLOBE, 41st Cong., 2d Sess. 1477-81 (1870).

13

impact on Blacks and Latinos. According to plaintiffs, Blacks and Latinos in New York are prosecuted, convicted, and sentenced to incarceration at rates substantially disproportionate to Whites. To support this assertion, plaintiffs cite to the 2000 census in their amended complaint: although Blacks constitute 15.9% of the state population, they comprise 54.3% of the current prison population and 50.0% of the current parolee population in New York; although Latinos constitute 15.1% of the state population, they comprise 26.7% of the current prison population and 32.0% of the current parolee population in New York; and although Whites constitute 62.0% of the state population, they comprise only 16.0% of current prisoners and parolees. Thus, collectively, Blacks and Latinos constitute 81.0% of the total current prison population and 82.0% of the total current parolee population, despite being only 31.0% of the overall state population.

Furthermore, "Blacks and Latinos are sentenced to incarceration at substantially higher rates than Whites, and Whites are sentenced to probation at substantially higher rates than Blacks and Latinos. For example, in 2001 Whites made up approximately 32% of total felony convictions, yet comprised 44% of those who received probation and only 21.4% of those incarcerated for felony convictions. By contrast, Blacks made up 44% of those convicted of a felony, yet approximately only 35% of those sentenced to probation and over 51% of those sentenced to incarceration. Latinos comprised 23% of those convicted of a felony, yet only 19% of those sentenced to probation and over 26.5% of those sentenced to incarceration." In addition, although Whites make up 51% of the total population of persons currently sentenced to probation in New York, Blacks make up 30% and Latinos 14%. And finally, "[n]early 52% of those

14

currently denied the right to vote pursuant to New York State Election Law § 5-106(2), are Black

and nearly 35% are Latino. Collectively, Blacks and Latinos comprise nearly 87% of those

currently denied the right to vote pursuant to New York State Election Law § 5-106(2)."

### C.     *Alleged Disparate Application of New York State Election Law § 5-106*

New York law prohibits convicted felons from voting while they are serving a prison

sentence or while they are on parole following a prison sentence. *See* N.Y. ELEC. LAW § 5-

106(2). New York does, however, allow felons to vote if they have completed their maximum

sentence of imprisonment including parole, received suspended or commuted sentences, or been

sentenced to probation or conditional or unconditional discharge. *See* N.Y. ELEC. LAW § 5-

106(2), (5). Plaintiffs claim that, because this law is non-uniform in its distinctions between

felons who are and are not disenfranchised, it violates the requirements of the Equal Protection

Clause of the Fourteenth Amendment.

**DISCUSSION**

**I.     Standard of Review**

We review *de novo* a district court's decision to grant a motion for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c).[7] *Johnson v. Rowley*, 569 F.3d 40,

43 (2d Cir. 2009) (per curiam). In deciding a Rule 12(c) motion, we "employ[] the same

standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)." *Id.* (internal quotation

marks omitted). "Thus, we will accept all factual allegations in the complaint as true and draw

---

[7] Rule 12(c) states that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).

15

all reasonable inferences in [plaintiffs'] favor. To survive a Rule 12(c) motion, [plaintiffs'] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 43-44 (internal citation and quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)).

Although this appeal was briefed and argued prior to the Supreme Court's decision in *Iqbal*, the standard enunciated by the Court in that decision, which clarified the rationale of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), controls our analysis of plaintiffs' amended complaint.[8] In *Iqbal*, the Supreme Court suggested a "two-pronged approach" to evaluate the sufficiency of a complaint. 129 S. Ct. at 1949-50. A court "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950; *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks and alteration omitted)). At the second step, a court should determine whether the "well-pleaded factual allegations," assumed to be true, "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950; *see also Harris*, 572 F.3d at 72 ("Second, only a complaint that states a plausible claim for relief survives a motion to dismiss, and determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial

---

[8] On May 28, 2009, we ordered the parties to provide supplemental briefing as to the impact of the Supreme Court's decision in *Iqbal* on this case. Plaintiffs filed their supplemental brief on June 17, 2009, and defendants filed their supplemental brief on June 26, 2009.

experience and common sense." (internal quotation marks and alteration omitted)).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted).[9]

## II.   Intentional Discrimination

The first question presented by this case is whether the District Court erred in dismissing plaintiffs' claim of intentional discrimination at the pleadings stage for providing insufficient factual allegations.  Although, as discussed in greater detail *infra*, we find plaintiffs' allegations sufficient with regard to the 1821, 1846, and 1874 constitutional provisions, we find that plaintiffs fail to allege any non-conclusory facts to support a finding of discriminatory intent as to the 1894 provision or subsequent statutory enactments.  Accordingly, we conclude that plaintiffs fail to state a claim that is plausible on its face or, stated differently, that "nudge[] [their] claims of invidious discrimination across the line from conceivable to plausible." *Iqbal*, 129 S. Ct. at 1951 (internal quotation marks omitted).  We will remand to the District Court, however, to allow plaintiffs to seek leave to amend their deficient complaint.

### A.   *First* Iqbal *Prong–Conclusory Pleadings*

We begin our analysis by reviewing plaintiffs' amended complaint for allegations that are

---

[9] Of course, even when a complaint falls short of these standards, a court should freely give leave to amend before trial "when justice so requires." FED. R. CIV. P. 15(a)(2); *cf. Iqbal*, 129 S. Ct. at 1954 (remanding to this Court to "decide in the first instance whether to remand to the District Court so that respondent can seek leave to amend his deficient complaint"); *Iqbal v. Ashcroft*, 574 F.3d 820, 822 (2d Cir. 2009) (per curiam) (remanding to district court for further proceedings).

17

conclusory and thus are not entitled to the assumption of truth. *Id.* at 1950. Plaintiffs allege, for example, that "[t]he disenfranchisement of felons was one aspect of [constitutional delegates adopting certain voting requirements] to deprive minorities of the right to vote," J.A. 106, ¶ 42, which is a "bare assertion[] . . . amount[ing] to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim," *Iqbal*, 129 S. Ct. at 1951 (internal quotation marks omitted) (finding the following similar allegations conclusory: that particular defendants "'knew of, condoned, and willfully and maliciously agreed to subject [plaintiff]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest'"; and that defendant "Ashcroft was the 'principal architect' of this invidious policy and [defendant] Mueller was 'instrumental' in adopting and executing it" (internal citations omitted)). Similarly, plaintiffs' allegation that the 1821 Constitution "further restricted the suffrage of minorities by permitting the state legislature to disenfranchise persons 'who have been, or may be, convicted of infamous crimes'" is conclusory, for whether the facially neutral disenfranchisement provision "restricted the suffrage of minorities" in effect *and intent* is the very assertion that plaintiffs must prove. Finally, plaintiffs allege that New York Election Law § 5-106(2) "was enacted pursuant to . . . the New York State Constitution with the intent to disenfranchise Blacks," which is not only a bare assertion, but is the only allegation in plaintiffs' amended complaint that New York's felon disenfranchisement *statutory* provisions were enacted with discriminatory intent.

18

After setting aside these and other conclusory allegations,[10] we nonetheless find, for the reasons discussed below, that plaintiffs have alleged sufficient facts to show that the 1821, 1846, and 1874 constitutional provisions were enacted with a racially discriminatory purpose. But, fatal to plaintiffs' intentional discrimination claim, they have failed to allege that this invidious purpose motivated the enactment of either the 1894 constitutional provision or any of the statutory provisions. Moreover, plaintiffs do not plausibly allege that the 1971 or 1973 amendments to New York Election Law § 5-106(2) were enacted because of the 1894 Constitution's mandate that the legislature enact felon disenfranchisement laws.

**B.      Second Iqbal _Prong–Plausibility of Intentional Discrimination Claim_**

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." _Washington v. Davis_, 426 U.S. 229, 239 (1976). To violate the Fourteenth Amendment a statute need not be facially discriminatory, for even "[a] statute, otherwise neutral on its face," violates the Fourteenth Amendment if it is applied "so as invidiously to discriminate on the basis of race." _Id._ at 241. However, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." _Vill. of Arlington Heights v. Metro. Hous. Dev. Corp._, 429 U.S. 252, 265 (1977). Although "[d]isproportionate impact is not irrelevant," _Washington_, 426 U.S.

---

[10] We also find to be conclusory, and therefore not entitled to the assumption of truth, plaintiffs' allegations that, during the 1821 Constitutional Convention, "delegates designed new voting requirements aimed at stripping Black citizens of their previously held right to vote," and that, during unspecified constitutional conventions, delegates "crafted . . . provisions with seemingly neutral language that they knew would have a discriminatory effect on racial minorities."

19

at 242, to violate the Fourteenth Amendment "the disproportionate impact must be traced to a *purpose* to discriminate on the basis of race," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 260 (1979) (emphasis added) (citing *Washington*, 426 U.S. at 238-44).[11]

"'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker[s], in this case [constitutional delegates and] a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279 (citation and footnote omitted). However, while a plaintiff must prove that there was a discriminatory purpose behind the course of action, a plaintiff need not prove that the "challenged action rested solely on racially discriminatory purposes." *Arlington Heights*, 429 U.S. at 265; *see also Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (stating that "an additional purpose . . . would not render nugatory the purpose to discriminate against all Blacks"); *Feeney*, 442 U.S. at 277 ("Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not.").

---

[11] In the ordinary course of litigation, "[o]nce racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *see also Arlington Heights*, 429 U.S. at 270 n.21. Given that this is an appeal from a judgment on the pleadings, however, we need not concern ourselves with the burden-shifting scheme applicable to intentional discrimination claims. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) (explaining that establishing prima facie case under burden-shifting scheme applicable to employment discrimination claims "is an evidentiary standard, not a pleading requirement"). Our only concern is the first step in this analysis, i.e., whether or not plaintiffs have adequately alleged that racial discrimination was a substantial or motivating factor behind the enactment of New York's felon disenfranchisement laws.

Because discriminatory intent is rarely susceptible to direct proof, litigants may make "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it bears more heavily on one race than another—may provide an important starting point." *Arlington Heights*, 429 U.S. at 266 (internal quotation marks and citation omitted). But unless a "clear pattern, unexplainable on grounds other than race, emerges," *id.*, "impact alone is not determinative, and the Court must look to other evidence," *id.* (footnote omitted). In *Arlington Heights*, the Supreme Court identified a non-exhaustive list of some subjects of proper inquiry for determining whether a racially discriminatory intent existed, including "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," *id.* at 267, "[d]epartures from the normal procedural sequence," *id.*, "[s]ubstantive departures," *id.*, and "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports," *id.* at 268. The Court has noted, however, that "[p]roving the motivation behind official action is often a problematic undertaking." *Hunter*, 471 U.S. at 228.

Here, plaintiffs undoubtedly have alleged sufficient facts to establish the disproportionate *impact* of New York's felon disenfranchisement laws on Blacks and Latinos, as compared with Whites. *See supra* Background, Part III.B. The question remains, however, as to whether plaintiffs have sufficiently "traced" that impact "to a *purpose* to discriminate on the basis of race," *Feeney*, 442 U.S. at 260 (emphasis added), thereby stating a plausible claim of intentional race discrimination.

21

The Supreme Court has specifically addressed the constitutionality of felon disenfranchisement laws on two occasions. First, in *Richardson v. Ramirez*, the Court held that a state may constitutionally exclude convicted felons from the franchise because § 2 of the Fourteenth Amendment provides an "affirmative sanction" for such exclusion, 418 U.S. 24, 53-54 (1974),[12] even though § 1 provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws," U.S. CONST. amend. XIV, § 1. Then, in *Hunter*, the Supreme Court held that even though *Richardson* said that felon disenfranchisement laws were generally constitutional under § 2 of the Fourteenth Amendment, Alabama's felon disenfranchisement provision nonetheless violated the Equal Protection Clause because it was enacted with discriminatory intent. *Hunter*, 471 U.S. at 233. The Court stated that it was "confident that § 2 was not designed to permit the purposeful racial discrimination attending the enactment and operation of [a state constitutional provision] which otherwise violates § 1 of the Fourteenth Amendment." *Id.*; *see also Hayden I*, 449 F.3d at 316 n.11 ("The Fourteenth

---

[12] The Fourteenth Amendment, § 2 provides, "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, *except for participation in rebellion, or other crime*, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State." U.S. CONST. amend. XIV, § 2 (emphasis added). "Several courts [in addition to the *Ramirez* Court] have recognized the propriety of excluding felons from the franchise." *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1225 (11th Cir.) (en banc), *cert. denied*, 546 U.S. 1015 (2005); *see, e.g.*, *Hayden I*, 449 F.3d 305, 316-17 (2d Cir. 2006) (en banc); *Green v. Bd. of Elections*, 380 F.2d 445, 450-52 (2d Cir. 1967), *cert. denied*, 389 U.S. 1048 (1968).

Amendment, as interpreted by the Supreme Court, does not completely insulate felon disenfranchisement provisions from constitutional scrutiny. It is clear, for example, that if a State disenfranchises felons 'with the intent of disenfranchising Blacks,' that State has run afoul of [§] 1 of the Fourteenth Amendment."). Thus, while felon disenfranchisement laws are generally constitutional under § 2 of the Fourteenth Amendment, such laws will be held unconstitutional under § 1 if the laws are enacted with discriminatory intent.

As an initial matter, we find that plaintiffs have alleged sufficient facts to support a plausible claim that the 1821, 1846, and 1874 felon disenfranchisement constitutional provisions were passed at least in part because of their adverse effects on Blacks. First, plaintiffs allege that during the New York Constitutional Convention in 1821, there were "heated discussions" during which delegates expressed the view that Blacks were "natural[ly] inferior[] and unfit[] for suffrage." J.A. 107, ¶ 46; *see also Debates of 1821*, *supra*, at 191, 199 (reflecting delegates' view that prisons were largely populated by Blacks). Plaintiffs further allege that specific property and citizenship requirements tied to voting, which expressly applied only to Blacks, were incorporated in the Constitution of 1821. Second, plaintiffs assert that at the Constitutional Convention in 1846, "heated debates" continued regarding Blacks' unfitness for suffrage, "including a declaration that the proportion of [felonies committed] in the minority population was more than thirteen times that in the White population." Finally, plaintiffs state that New York's *explicit* discriminatory suffrage requirements were in place until voided by the adoption of the Fifteenth Amendment in 1870, but that "two years after the passage of the Fifteenth Amendment, an *unprecedented* committee convened and amended the disenfranchisement

23

provision of the New York Constitution to require the state legislature, at its following session, to enact laws excluding persons convicted of infamous crimes from the right to vote."[13]  Drawing all reasonable inferences in favor of plaintiffs based on these well-pleaded factual allegations, we find that plaintiffs satisfy the *Iqbal* plausibility standard as to the alleged discriminatory intent behind the pre-1894 constitutional provisions.

The issue we are confronted with here, though, is whether the enactment of the 1894 constitutional provision, albeit preceded by earlier provisions that plausibly admit of racist origins, can support an equal protection claim.  More specifically, the issue here is whether plaintiffs adequately allege intentional discrimination where they have pleaded sufficient factual matter to plausibly show that the 1821, 1846, and 1874 enactments were motivated by a discriminatory purpose, but where they have not made any adequately supported factual allegations of impermissible motive affecting the delegates to the 1894 convention.  *See McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (recognizing that historical background of a decision is one source of evidence for proof of intentional discrimination under *Arlington Heights*, but that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value"); *see also City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion by Stewart, J.) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.  The ultimate question remains whether

_____

[13] Although plaintiffs' allegations as to the 1874 enactment are less direct than their allegations as to prior constitutional enactments, we are satisfied that the alleged close temporal proximity to the passage of the Fifteenth Amendment and the "unprecedented" nature of the committee convened indicates a "[d]eparture[] from . . . normal procedur[es]," which "might afford evidence that improper purposes are playing a role."  *Arlington Heights*, 429 U.S. at 267.

24

a discriminatory intent has been proved in a given case. More distant instances of official discrimination in other cases are of limited help in resolving that question."), *superseded by statute on other grounds as explained in Hayden I*, 449 F.3d at 313, 320-21; *cf. Arlington Heights*, 429 U.S. at 268 (stating that legislative history "may be highly relevant, especially where there are *contemporary* statements by members of the decisionmaking body" (emphasis added)). We hold that, under these circumstances, plaintiffs fail to state a plausible claim of intentional discrimination as to the enactment of the 1894 constitutional provision, which continues in effect today.

The Supreme Court's decision in *Hunter* does not alter our conclusion. In *Hunter*, the Court held that Alabama's 1901 constitutional disenfranchisement provision violated the Equal Protection Clause because "its original enactment was motivated by a desire to discriminate against Blacks on account of race and the section continues to this day to have that effect." 471 U.S. at 233. The *Hunter* Court did not decide, however, "whether [the 1901 provision] would be valid if enacted today without any impermissible motivation." *Id.*; *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 465 n.17 (1985) (Marshall, J., concurring in the judgment in part and dissenting in part) ("Recently we held that extant laws originally motivated by a discriminatory purpose continue to violate the Equal Protection Clause, even if they would be permissible were they reenacted without a discriminatory motive." (citing *Hunter*, 471 U.S. 222-23)). The Court did reject the argument that intervening events, such as the *judicial* invalidation of "[s]ome of the more blatantly discriminatory selections, such as assault and battery on the wife and miscegenation," had cured the violation. *Hunter*, 471 U.S. at 233. It was clear in *Hunter*,

25

however, that "[a]fter the 1901 enactment, the Alabama *legislature* neither altered the provision nor reenacted it in a political atmosphere free of racial bias. Rather, all of the amendments to the provision were the result of judicial action." *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1222 (11th Cir.) (en banc) (emphasis added), *cert. denied*, 546 U.S. 1015 (2005). Accordingly, "[i]n *Hunter*, the Supreme Court left open the precise question we confront here: whether a subsequent legislative re-enactment can eliminate the taint from a law that was originally enacted with discriminatory intent." *Id.* at 1223; *see also id.* at 1223 n.20; *Cotton v. Fordice*, 157 F.3d 388, 391 & n.7 (5th Cir. 1998).

However, the *en banc* Eleventh Circuit in *Johnson* faced a very similar issue to the one we now confront. In *Johnson*, the Eleventh Circuit affirmed a grant of summary judgment in favor of defendants, rejecting plaintiffs' argument that Florida's felon disenfranchisement law violated the Equal Protection Clause. The plaintiffs contended that "racial animus motivated the adoption of Florida's criminal disenfranchisement provision in 1868 and this animus remains legally operative today, notwithstanding the fact that Florida altered and reenacted the provision in 1968." *Johnson*, 405 F.3d at 1217. After assuming, without deciding, that racial animus motivated the 1868 law, *id.* at 1223, the court held that "Florida's felon disenfranchisement provision is constitutional because it was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias," *id.* at 1225; *see also Cotton*, 157 F.3d at 391 ("Because Mississippi's [deliberative] procedure resulted both in 1950 and in 1968 in a re-enactment of [the state's felon disenfranchisement constitutional provision originally enacted in 1890], each amendment superseded the previous provision and removed the discriminatory taint associated

26

with the original version."); *United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994), *cert. denied*, 514 U.S. 1041 (1995) (rejecting plaintiffs' equal protection challenge to a 1986 federal statute based in part on the court's finding that "the undeniable racism that animated legislative debate leading to the passage of a *1914* statute criminalizing cocaine trafficking generally, long before the crack/powder distinction was contemplated," is "of no relevance to our inquiry into the motives of the Congress that passed the 1986 Act" (citing *McCleskey*, 481 U.S. at 298 n.20)).

Here, the 1894 amendment to New York's constitutional provision was not inconsequential. The provision that existed until that time, as amended in 1874, provided that the legislature was required to pass a felon disenfranchisement law at its next session, but thereafter the passage of such laws was left to the legislature's discretion, as it had always been. *See supra* n.2. In 1894, however, the constitutional delegates made permanent the mandatory aspect of the provision, and felon disenfranchisement laws have been required in New York ever since. This amendment served to substantively change how legislatures were permitted to consider, or no longer consider, whether felon disenfranchisement laws should be passed—such laws were mandated. Given this substantive amendment to New York's constitutional provision and the lack of any allegations by plaintiffs of discriminatory intent "reasonably contemporaneous with the challenged decision," *McCleskey*, 481 U.S. at 298 n.20, we cannot hold that plaintiffs state a plausible claim of intentional discrimination as to the 1894 constitutional provision, which is the bridge necessary for plaintiffs to sufficiently trace any disparate impact of New York Election Law § 5-106(2) "to a purpose to discriminate on the basis of race," *Feeney*, 442 U.S. at 260.

27

We do not take lightly the possibility that a legislative body might seek to insulate from challenge a law known to have been originally enacted with a discriminatory purpose by (quietly) reenacting it without significant change. *See Johnson*, 405 F.3d at 1246 (Barkett, J., dissenting) (expressing concern that "legislatures could continue to utilize statutes that were originally motivated by racial animus, and that continue to produce discriminatory effects, so long as they re-promulgate the statutes 'deliberately' and without explicit evidence of an illicit motivation"). But that concern is ameliorated here because (i) plaintiffs have not alleged any such bad faith on the part of the 1894 delegates; (ii) the 1894 amendment was not only deliberative, but was also substantive in scope; and (iii) there are simply no non-conclusory allegations of any kind as to discriminatory intent of the 1894 delegates even though the Supreme Court in *Arlington Heights* provides a non-exhaustive list of evidence that might establish discriminatory intent other than "*explicit* evidence of an illicit motivation." *See* 429 U.S. at 267 (stating that it is proper to consider "[d]epartures from the normal procedural sequence" or "[s]ubstantive departures").

Moreover, not only is a discriminatory purpose not alleged with respect to the 1894 enactment, but an "'obvious alternative explanation'" exists to support the propriety of the 1894 enactment. *See Iqbal*, 129 S. Ct. at 1951-52 (quoting *Twombly*, 550 U.S. at 567). As defendants contend, "prisoner disenfranchisement is more likely the product of legitimate motives than invidious discrimination," as demonstrated by its adoption in virtually every state, its affirmative sanction in § 2 of the Fourteenth Amendment, and its widespread support among New York politicians. *See, e.g.*, *Richardson v. Ramirez*, 418 U.S. 24, 53-54 (1974); *Hayden I*, 449 F.3d at 316-17 (describing "ancient origin" of disenfranchising those convicted of crimes dating back to

28

"ancient Athens" and the "Roman Republic," and noting that "[t]oday . . . every state except Maine and Vermont disenfranchises felons"); N.Y. ELEC. LAW § 5-106, Historical and Statutory Notes; *supra* Background, Part II.[14] In some cases, "notwithstanding [discriminatory] impact[,] the legitimate noninvidious purposes of a law cannot be missed." *Feeney*, 442 U.S. at 275 (explaining that the distinction made by the Massachusetts veterans preference law "is, as it seems to be, quite simply between veterans and nonveterans, not between men and women"); *see also Soberal-Perez v. Heckler*, 717 F.2d 36, 42 (2d Cir. 1983) (affirming dismissal of equal protection challenge to Secretary of Health and Human Services' failure to provide forms in Spanish because plaintiffs failed to suggest any evidence of discriminatory intent and legitimate noninvidious purpose was obvious), *cert. denied*, 466 U.S. 929 (1984). Absent any adequately supported factual allegations as to discriminatory intent behind the enactment of the 1894 constitutional provision, we are compelled to find that the New York Constitution's requirement

_____

[14] We also take judicial notice of the proceedings at the New York State Constitutional Convention of 1967. *See* Fed. R. Evid. 201(b), (c); *cf. Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 (2d Cir. 2002) (noting instances where judicial notice may be taken even if for the first time on appeal). During the convention, several propositions related to suffrage were advanced by delegates and referred to the Committee on Bill of Rights and Suffrage, all of which retained a felon disenfranchisement provision. *See, e.g.*, VI *Proceedings of the Constitutional Convention of the State of New York of 1967*, at 398-99, 485-86; VIII *id.* at 72-73, 773; IX *id.* at 376. The amended New York State Constitution eventually proposed to voters in November 1967, though ultimately rejected, provided that "[t]he legislature may disqualify persons from voting by reason of mental incompetency or felony conviction." XII *id.* at 6. Moreover, none of the debate surrounding voting disqualification provisions indicated any concern over the continued inclusion of a felon disenfranchisement provision. *See* II *id.* at 464-70; III *id.* at 678-79. All of this together reinforces that felon disenfranchisement remained widely supported more than 70 years after the last amendment to the New York State Constitution and that, absent any allegations to the contrary, the constitutional provision was more likely the result of legitimate motives.

29

that the legislature pass felon disenfranchisement laws is based on the obvious, noninvidious purpose of disenfranchising felons, not Blacks or Latinos.

Finally, there is another independent basis for our holding that plaintiffs fail to state a plausible claim of intentional discrimination. The 1894 constitutional provision, and all earlier constitutional provisions, simply authorize the New York legislature to enact felon disenfranchisement laws. That is, the constitutional provision does not operate to deny plaintiffs the right to vote, rather the statutory enactment pursuant to the constitutional provision does. Therefore, plaintiffs either must allege that the statutory enactments were motivated at least in part by discriminatory intent—which they have completely failed to do in their amended complaint[15]—or they must state a plausible claim that New York Election Law § 5-106 and all of its prior amendments were in fact passed because of the 1894 constitutional provision's mandate. It is *possible* that the legislature has acted since 1894 to enact felon disenfranchisement laws because it was required to under the constitutional provision. But given the more likely explanations discussed above and the laws' obvious, noninvidious distinction between felons and non-felons, it is not *plausible*, at least as plaintiffs' allegations presently read, that the New York legislature would have rejected a felon disenfranchisement statute if the statute had not been constitutionally required.

Accordingly, plaintiffs' amended complaint fails to state a plausible claim that New

---

[15] Plaintiffs not only fail to allege discriminatory intent with respect to any statutory enactments, but the significant amendments to New York Election Law § 5-106 in 1971 and 1973 were supported by the New York Urban Coalition, Citizens Union, the Legal Aid Society, the New York Civil Liberties Union, and the New York State Catholic Committee. None of these public interest organizations raised even an iota of concern about racial discrimination.

York's felon disenfranchisement laws were enacted with discriminatory intent. Although they have alleged sufficient facts to support a claim that the 1821, 1846, and 1874 constitutional provisions were motivated at least in part by discriminatory intent, they fail to allege any facts to support a claim that the 1894 constitutional provision or any of the New York legislature's statutory enactments were passed because of racial animus. However, in light of Federal Rule of Civil Procedure 15's suggestion that a "court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), and our preference to allow a district court to evaluate such a motion by plaintiffs in the first instance, *see Iqbal v. Ashcroft*, 574 F.3d 820, 822 (2d Cir. 2009) (per curiam), we will remand to the District Court to allow plaintiffs to seek leave to amend their deficient complaint as to this claim.

**III.     The Non-Uniformity of New York's Disenfranchisement Laws**

In addition to the claim of intentional race discrimination, plaintiffs also argue that § 5-106(2) violates the Equal Protection Clause of the Fourteenth Amendment because it "distinguishes among felons, denying the right to vote only to those felons sentenced to incarceration or serving parole, and not to those sentenced to probation." The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend XIV, § 1. This language has been interpreted to mean that "all persons similarly circumstanced shall be treated alike. But so too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (internal quotation marks, alteration, and citation omitted). Furthermore, we must grant substantial

31

latitude to the legislatures "to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Id.* Thus, the Supreme Court has held that—unless the legislature utilizes a classification that is inherently invidious because it disadvantages a suspect class, or because it infringes upon the exercise of a fundamental right—we exercise only a limited review power over the acts of legislatures. *See id.* at 216-17; *see also Schweiker v. Wilson*, 450 U.S. 221, 230 (1981). Under this limited review power, we will uphold forms of state action under the Equal Protection Clause so long as the classification at issue bears some rational relationship to a legitimate state interest. *Plyler*, 457 U.S. at 216. On the other hand, where a suspect class or a fundamental right is at issue in the classification, we apply a more searching form of scrutiny. *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 457-58 (1988); *see also Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995).

Thus, the threshold question for any analysis under the Equal Protection Clause is whether the highly deferential rational basis review applies, or instead whether the legislation involves a suspect class or a fundamental right resulting in the application of a stricter form of scrutiny. *Baker v. Cuomo*, 58 F.3d 814, 820 (2d Cir. 1995), *vacated in part, on other grounds, sub nom. Baker v. Pataki*, 85 F.3d 919 (1996) (en banc) (per curiam). Plaintiffs are correct in claiming that the Supreme Court has stated that "voting is of the most fundamental significance under our constitutional structure," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks omitted), and that the right to vote is the "fundamental political right," *Harper v.*

32

*Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (internal quotation marks omitted). We have clearly stated, however, that "[a]lthough the right to vote is generally considered fundamental, in the absence of any allegation that a challenged classification was intended to discriminate on the basis of race or other suspect criteria, statutes that deny felons the right to vote are not subject to strict judicial scrutiny." *Baker v. Cuomo*, 58 F.3d at 820 (citing Supreme Court and other court of appeals cases in support of proposition). Here, although plaintiffs argue that New York's felon disenfranchisement laws, in their constitutional origin, were intended to discriminate against Blacks, they do not claim that the statutory amendments in the 1970s, which made the application of the felon disenfranchisement laws non-uniform, were enacted with the intent to discriminate. Thus, in accord with our precedent, it is clear that we should review the legislation utilizing rational basis review, not strict scrutiny.[16]

When legislation is reviewed for a rational basis, "courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws." *Gregory v. Ashcroft*, 501 U.S. 452, 470-71 (1991) (internal quotation marks omitted). The Supreme Court has stated that courts should "not overturn such a [law] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes

---

[16] Plaintiffs argue in their reply brief that their claims are not foreclosed by *Baker*, because the Supreme Court case that *Baker* relied upon, *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), "left open a narrow exception to heightened scrutiny of voting restrictions for laws that distinguish among those individuals who have been convicted of a felony and those who have not," Brief for Appellants at 29-30. Plaintiffs' argument that *Ramirez* left open this exception is weak. Furthermore, given the Second Circuit's clear rule on this matter in *Baker* it would be improper for us to reverse settled Second Circuit precedent without a clearer statement from the Supreme Court on the matter.

33

that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979).  Furthermore, the Supreme Court has emphasized that under rational basis review, legislatures are allowed to act incrementally: the Equal Protection Clause "does not compel . . . [l]egislatures to prohibit all like evils, or none.  A legislature may hit at an abuse which it has found, even though it has failed to strike at another." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 151 (1938); *see also Gregory*, 501 U.S. at 473; *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 489 (1955).

Here, two amendments to the felon disenfranchisement statute are at issue.  First, the 1971 bill amended the election law by providing a person convicted of a felony with the right to vote upon the expiration of his maximum sentence or when he is discharged from parole. When passing this amendment, the legislature made the state interest clear.  Explaining that the primary purpose of the penal system was the rehabilitation of the offender, the state's justifications for the 1971 amendment were as follows: (1) once the offender has served his sentence or been discharged from parole, he is presumed to be capable of rejoining society; (2) it is inconsistent with the general philosophy of corrections to continue punishment, in the form of not being able to vote, after a person has accounted for his actions; and (3) providing an offender with the right to vote would help effectuate his transfer back into society in a favorable way.  Under our highly deferential standard, the 1971 amendment clearly bears a rational relationship to the government's stated legitimate interest.

Second, the 1973 amendment to the bill further expanded the right to vote by giving felons who have received a suspended sentence the right to vote.  Again, in passing this

34

amendment the state legislature clarified the state's interest. The purpose of this amendment was to remove some confusion that had arisen after the 1971 amendment, because the 1971 amendment failed to address felons who were not incarcerated because their sentences were suspended. This amendment also bears a rational relationship to the expressed legitimate state interest. As the Legal Aid Society wrote in its letter supporting the amendment,

> [t]his bill is a modest but worthwhile step towards the goal of fully reintegrating convicted persons into society as soon as this may be done consistent with the public interest. Where a judge has determined that imprisonment is not necessary, it is difficult to perceive any useful purpose to be served by denying a convicted person the right to vote during the period of probation or conditional release.

It is true that there remains some oddity in the laws in that those who have finished their prison terms, but are still on parole, are denied the right to vote while those with suspended sentences are not. However, rational basis review allows legislatures to act incrementally and to pass laws that are over (and under) inclusive without violating the Fourteenth Amendment. *See Gregory*, 501 U.S. at 473; *Williamson*, 348 U.S. at 489. Thus, we hold that the District Court was correct in dismissing plaintiffs' claim that the non-uniformity of New York Election Law § 5-106(2) violates the Equal Protection Clause.

**CONCLUSION**

Accordingly, because plaintiffs fail to state a plausible claim of intentional discrimination and fail to make a claim that the non-uniformity of § 5-106(2) violates their rights under the Equal Protection Clause, we AFFIRM the District Court's grant of judgment on the pleadings to defendants. We REMAND to the District Court, however, so that plaintiffs can seek leave to amend their deficient complaint as to their intentional discrimination claim.