# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 10, 2007      Decided November 13, 2007

No. 06-5358

THE BANK OF NEW YORK,
AS INDENTURE TRUSTEE OF THE NEXTBANK CREDIT CARD
MASTER NOTE TRUST,
APPELLANT

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
IN ITS CAPACITY AS RECEIVER FOR NEXTBANK N.A.,
APPELLEE

Consolidated with
07-5074

Appeals from the United States District Court
for the District of Columbia
(No. 03cv01221)
(No. 06cv01975)


*H. Stephen Harris, Jr.* argued the cause and filed the briefs for appellant.

*Jaclyn C. Taner*, Counsel, Federal Deposit Insurance Corporation, argued the cause for appellee. With her on the

brief were *Richard J. Osterman, Jr.*, Assistant General Counsel, *Colleen J. Boles*, Senior Counsel, and *Dennis S. Klein* and *Scott H. Christensen*.

Before: HENDERSON, RANDOLPH and BROWN, *Circuit Judges*.

RANDOLPH, *Circuit Judge*: The main issue in these consolidated appeals from the judgments of the district court is whether the Federal Deposit Insurance Corporation ("FDIC"), as the receiver for NextBank, had the authority to disregard an acceleration clause requiring the payment of interest and principal to noteholders when NextBank failed. Judge Huvelle issued a thorough opinion on the issue, and we closely follow her analysis in deciding to affirm.

NextBank, a wholly owned subsidiary of NextCard, Inc., was a limited purpose national credit card bank. As such, it could not make commercial loans, and its other activities were restricted. NextBank issued credit cards that NextCard originated over the Internet. By February 2002, NextBank had 1.2 million holders of its Visa credit cards and credit card receivables totaling $1.9 billion.

Credit card issuers make revolving, personal, unsecured loans to their customers. The cardholder makes purchases subject to a credit limit; the issuing financial institution pays the merchant's bank; the cardholder's purchases are consolidated into a monthly bill; and the cardholder pays the bill in full with no finance charge or in part with a finance charge computed on the unpaid balance.

Some credit card banks "securitize" their credit card receivables. *See* Charles W. Calomiris & Joseph R. Mason, *Credit Card Securitization and Regulatory Arbitrage* (Fed.

Reserve Bank of Phila., Working Paper No. 03-7, 2003). NextBank's securitization was typical: it sold a portion of its credit card receivables to a special purpose entity, the Master Trust. The trust paid NextBank by selling securities backed by the cash flows from the receivables. There were four classes of securities or "Notes," which varied by degree of risk. NextBank serviced the credit cards and deposited cardholders' payments into a series of accounts (collectively the "Collection Account"). It also retained about a 9 percent seller's interest in the receivables.[1] The Bank of New York, as indenture trustee, maintained the Collection Account and made distributions to noteholders based on formulas corresponding to specific classes of Notes.

Securitization offered NextBank several benefits. First, NextBank received cash immediately rather than waiting for the credit card holders to pay off their debts. Second, because NextBank "sold" the receivables, accounting rules permitted it to remove them from its balance sheet, thereby freeing up capital. Third, NextBank obtained cheaper funding because the trust's separate legal status isolated the noteholders from NextBank's underlying business risk. Faced only with the risk inherent in the receivables, investors accepted lower interest payments.

The securitization transaction consisted of four main documents. The Trust Agreement created the Master Trust and set forth its powers. Although the trust was a legally separate entity, it was wholly owned and operated by NextBank. The Administration Agreement obligated NextBank to perform duties of the trust as specified under the other documents. The

---

[1]The seller's interest is the difference between the total amount of securitized receivables and the trust's outstanding debt.

Transfer and Servicing Agreement provided for the conveyance of receivables to the trust and for servicing of the receivables by NextBank.

The Master Indenture provided for issuance of the receivable-backed Notes and imposed a variety of obligations on the trust, the Bank of New York, and NextBank. One of the clauses, the ipso facto or acceleration clause contained in Article V, § 5.01, provided that the payment of interest and principal on the Notes would be accelerated if NextBank went into receivership. NextBank signed all the agreements on lines designating it a party except the Master Indenture, which it signed on a line marked "Acknowledged and Accepted." The trust and the Bank of New York signed as parties.

NextBank's operational problems, including its issuance of credit cards to subprime customers without verifying information they supplied online, ultimately led to its downfall. When the FDIC stepped in as receiver in February 2002, it was faced with three options: abide by the acceleration clause and keep the credit card accounts open; abide by the acceleration clause and close the credit card accounts, prohibiting any new charges; or disregard the acceleration clause and continue the securitization, essentially stepping into NextBank's shoes. The first option would have required the FDIC to use $760 million of its own funds to operate the credit card business. The FDIC concluded that the third option was the least costly, and purported to exercise its authority to enforce the transaction documents under the Financial Institutions Reform Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183.

The credit card portfolio continued to struggle under the FDIC's direction. Five months into the receivership, the portfolio failed to meet a financial performance standard,

triggering another acceleration provision. The FDIC repudiated substantially all of its obligations under the transaction documents pursuant to 12 U.S.C. § 1821(e)(1), but continued to pay interest and principal to the noteholders. Class A and B noteholders were fully repaid, Class C noteholders received half their principal, and Class D noteholders received no principal.

Acting on behalf of the Class C and D noteholders, the Bank of New York sued the FDIC for conversion for not immediately accelerating interest and principal payments upon NextBank's receivership. The Bank of New York claimed that the noteholders suffered $800 million in losses during that five-month window because the FDIC used collections to continue to service the credit cards rather than make accelerated payments to the noteholders. Judge Huvelle granted summary judgment to the FDIC, holding that the FDIC properly disregarded the acceleration clause pursuant to its authority under 12 U.S.C. § 1821(e)(12) (2000).[2] The Bank of New York appealed on October 27, 2006 ("2006 Appeal").

Shortly afterward, the noteholders directed the Bank of New York (1) to exercise control over the receivables to repay the Notes and (2) to sue the trust for amounts outstanding on the Notes. The noteholders threatened to sue the Bank of New York if it did not comply. In turn, citing the district court's decision, the FDIC threatened to sue the Bank of New York if it did comply. The Bank of New York filed an interpleader action in New York state court seeking resolution of the conflicting

[2]Congress has redesignated this section as § 1821(e)(13). *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 904(a)(1), 119 Stat. 23, 165. We use the pre-2005 numbering because that was in effect at the time the Agency acted and for consistency with Judge Huvelle's opinion and the parties' briefs.

claims to the receivables.  The FDIC then sued in the District of Columbia to enjoin the Bank of New York from suing the trust and seizing the receivables.  Judge Huvelle granted the FDIC's requested injunctions, and the Bank of New York appealed on February 28, 2007 ("2007 Appeal").

I.

As receiver the FDIC "may enforce any contract . . . entered into by the depository institution notwithstanding any provision of the contract providing for" acceleration upon appointment of a receiver.  12 U.S.C. § 1821(e)(12)(A).  Accordingly, for the FDIC to have validly disregarded the Master Indenture's acceleration provision, NextBank must have "entered into" that agreement.  But what does "entered into" mean?  The Bank of New York tells us that it means "became a party to."  It means this because that is the definition of "enter into" contained in *Black's Law Dictionary*.  *See* BLACK'S LAW DICTIONARY 552 (7th ed. 1999).  We agree with Judge Huvelle that things are not so simple.

To begin, why choose *Black's*?  Other dictionaries contain broader definitions of these words.  *See* 5 OXFORD ENGLISH DICTIONARY 288 (2d ed. 1989) (defining "enter into" as, *inter alia*, "To take on oneself," "To take part in," and "To take an interest in"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 757 (1981) (defining "enter into" as, *inter alia*, "to participate or share in").  That *Black's* favors the Bank of New York's reading obviously cannot be a reason for choosing it over the others.  *See Alarm Indus. Commc'ns Comm. v. FCC*, 131 F.3d 1066, 1069 (D.C. Cir. 1997).  The Bank of New York says we should prefer *Black's* because "entered into" is a legal term.  But statutes are filled with legal terms, and yet we have never supposed that only *Black's* should be consulted for their meaning.  *Cf. Buckhannon Bd. & Care Home, Inc. v. W. Va.*

*Dep't of Health & Human Res.*, 532 U.S. 598, 615–16 (2001) (Scalia, J., concurring). The printed dictionaries, *Black's* included, may be useful, but "we cannot be sure what was in the mental dictionaries of the members of Congress." *Doris Day Animal League v. Veneman*, 315 F.3d 297, 299 (D.C. Cir. 2003). Besides, as Judge Huvelle pointed out, even if "entered into" means "became a party to," this still leaves questions. We have said before that a "definition only pushes the problem back to the meaning of the defining terms." *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006). And so one must ask what is a "party"? If the answer is that a "party" may be "[o]ne who takes part in a transaction," BLACK'S LAW DICTIONARY 1144 (7th ed. 1999), we are still left with the question what is the meaning of "takes part"?

All indications are that NextBank participated in the transaction with which we are concerned – the consummation of the Master Indenture. Whatever the reach of § 1821(e)(12)(A) and its "entered into" language, we believe, as did Judge Huvelle, that whenever an entity agrees to undertake obligations and gain rights in a contract, that entity has "entered into" the contract. Here the Master Indenture imposed a number of binding obligations on NextBank. For example, the Indenture required NextBank to "pay to the Indenture Trustee [the Bank of New York] from time to time reasonable compensation for all services rendered" under the Indenture, § 6.07; to "prepare or . . . cause to be prepared" tax returns, § 6.13; to "establish and maintain . . . Qualified Accounts," § 8.03; to "apply or . . . instruct the Indenture Trustee to apply all funds on deposit in the Collection Account," § 8.04(a); and to "deposit Collections into the Collection Account" at specified times, *id*. NextBank acknowledged these binding duties when it signed the Master Indenture. That NextBank did not sign on a line designating it a party cannot alter the substance of the contract terms. NextBank was legally obligated to perform these functions, and

the line on which it did sign stated that it had "Acknowledged and Accepted" the Master Indenture.

The Bank of New York tells us that NextBank's obligations under the Master Indenture actually arose under other securitization documents, particularly the Transfer and Servicing Agreement, and were merely "referred to" in the Master Indenture. Pet'r Br. 38. Even so, that would not change the fact that NextBank was bound by the Master Indenture. For instance, in an opinion letter, NextBank's own counsel stated as part of its assumptions that "each of the [securitization] Documents constitutes the legal, valid, and binding obligation of [NextBank] and is enforceable against [NextBank] in accordance with the terms thereof." There is no doubt that NextBank could have been sued for violating the Master Indenture.

Moreover, the record does not support the Bank of New York's contention that the Master Indenture duties were merely duplicative. The Bank of New York has not cited, in its briefs or during oral argument, specific provisions of the Transfer and Servicing Agreement that encompass NextBank's obligations under the Master Indenture. Where these duties are stated in the Master Indenture, there are no concurrent references to the other agreements. We have been unable to find anything in the other contracts that matches the duties described above.[3]

To be sure, there are provisions in the documents that address the same subject matter. For instance, Section 3.01(e) of the Transfer and Servicing Agreement states that NextBank "shall pay out of its own funds . . . fees and disbursements of the . . . Indenture Trustee." But this is not the same as requiring

---

[3]The full Transfer and Servicing Agreement is not in the record.

paying "from time to time reasonable compensation." Indeed, that same provision of the Master Indenture refers to NextBank's "payment obligations to the Indenture Trustee *pursuant to this Section 6.07*" (emphasis added). Similarly, Section 3.01(b) of the Transfer and Servicing Agreement states that NextBank "shall collect and deposit into the Collection Account amounts received under the Receivables." But this does not specify *when* deposits are to be made, a requirement recited in Section 8.04 of the Master Indenture. Some of the Bank of New York's own documentation contradicts its contentions. In its Proof of Claim before the FDIC, it stated that "pursuant to Section 6.07 *of the Indenture*, the Servicer [i.e., NextBank] is required to pay the expenses of the Trust, including legal fees" (emphasis added). We therefore conclude that the Master Indenture set forth independent obligations of NextBank.

The restrictions in 12 C.F.R. § 360.6 do not change our conclusion that the FDIC acted validly. That regulation prohibits the FDIC from disaffirming or repudiating contracts through § 1821(e)(1) in order to "reclaim, recover, or recharacterize" as its own property "any financial assets transferred . . . in connection with a securitization." 12 C.F.R. § 360.6(b). The Bank of New York argues that the FDIC violated this prohibition by repudiating the ipso facto clause and failing to accelerate payments. But this is not an accurate description of the FDIC's action. Section 360 deals with the FDIC's authority to "disaffirm or repudiate any contract" pursuant to § 1821(e)(1). The FDIC did not repudiate the Master Indenture under § 1821(e)(1). *Compare FDIC v. Ernst & Young LLP*, 374 F.3d 579, 584 (7th Cir. 2004). Rather, it continued the securitization transaction as executed in the transaction documents. This constitutes "enforce[ment] . . . notwithstanding any provision of the contract providing for" acceleration. § 1821(e)(12)(A). If ignoring an ipso facto clause

were seen as a repudiation, then every such action under § 1821(e)(12) would become an action under § 1821(e)(1).

Because NextBank entered into the Master Indenture by agreeing to undertake rights and obligations, the FDIC validly enforced that contract notwithstanding the ipso facto clause. Accordingly, we affirm Judge Huvelle's judgment in the 2006 Appeal.

II.

The Bank of New York raises four issues with respect to its 2007 Appeal. The first is whether collateral estoppel bars it from litigating whether the trust is liable for failing to accelerate payments pursuant to the ipso facto clause. The Bank of New York argues that the first case addressed the FDIC's liability, not the trust's. The idea is that the § 1821(e)(12) defense only protects the FDIC and cannot protect any other entities. Judge Huvelle, in her merits decision in 2006, determined that the FDIC validly enforced the transaction documents notwithstanding the ipso facto clause. In other words, it was proper for the transactions to continue as if the acceleration clause had no effect. Given this ruling, there is no room for argument that the trust could be liable for failure to give effect to the acceleration clause. Judge Huvelle thoroughly explained why the issue of the trust's liability was presented and decided. *See FDIC v. Bank of N.Y.*, 479 F. Supp. 2d 1, 14–18 (D.D.C. 2007).

The Bank of New York also argues that the noteholders were necessary parties in the district court. Federal Rule of Civil Procedure 19(a) requires that a non-party "be joined if feasible" if "(1) complete relief cannot be accorded in its absence; or (2) the absentee's ability to protect its interests may be impaired by the disposition of the action; or (3) those already

parties will be subject to a substantial risk of incurring inconsistent obligations because of the absence." *Cloverleaf Standardbred Owners Ass'n v. Nat'l Bank of Wash.*, 699 F.2d 1274, 1278–79 (D.C. Cir. 1983). There is nothing to the Bank of New York's contention that the noteholders' interests were impaired because "the court's ruling requires that assets claimed by the noteholders be given instead to the" FDIC. Pet'r Br. 47. Rule 19 turns on the noteholders' ability to protect their interests, and a party can adequately protect a non-party. *See Ramah Navajo Sch. Bd. v. Babbitt*, 87 F.3d 1338, 1351 (D.C. Cir. 1996). The Bank of New York, as trustee, has done that. *See* 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1618, at 284 (3d ed. 2001); *see also Green v. Brophy*, 110 F.2d 539, 542 (D.C. Cir. 1940).

The Bank of New York's third point is that it is subject to inconsistent obligations because both the noteholders and the FDIC claim rights to the funds. We have already decided that the FDIC properly ignored the acceleration clause and that the issue cannot be relitigated. The noteholders thus have no actual claim to the funds.

The Bank of New York's final challenge is to venue. Venue was proper in the district court because the FDIC's decisionmaking and the prior judgment constitute a "substantial part of the events . . . giving rise to the claim." 28 U.S.C. § 1391(b)(2). The FDIC sued on the basis of the district court's earlier decision. In any event, the Bank of New York does not appear to dispute the district court's assertion that venue was proper to enforce the court's prior judgment. *See* 479 F. Supp. 2d at 13; Pet'r Br. 51.

*Affirmed.*