09-1628-cv
The Bank of New York v. First Millennium, Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: March 4, 2010                              Decided: June 1, 2010)

Docket No. 09-1628-cv

THE BANK OF NEW YORK, in its capacity as Indenture Trustee
for the NextCard Credit Card Master Note Trust,

*Interpleader Plaintiff-Counter Claimant Defendant-Appellee,*

— v.—

FIRST MILLENNIUM, INC., MILLENNIUM PARTNERS, L.P., RMK
ADVANTAGE INCOME FUND,

*Interpleader Defendants-Appellees,*

and FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as
Receiver for NextBank, N.A.,

*Interpleader Defendant-Counter Claimant-Appellant**

B e f o r e:

---

* The Clerk of the Court is directed to amend the official caption in this case to conform
to the listing of the parties above.

LYNCH and CHIN, *Circuit Judges.*[*]

_____

Interpleader defendant–counter claimant–appellant, the Federal Deposit Insurance Corporation, appeals from orders of the United States District Court for the Southern District of New York (Haight, *J.*) (1) denying a motion to transfer the action to the United States District Court for the District of Columbia (entered on May 10, 2007), (2) enjoining interpleader plaintiff–counter claimant defendant–appellee, The Bank of New York, from making distributions of the interpleader funds (entered on July 5, 2007), (3) dismissing its counterclaims against interpleader plaintiff–counter claimant defendant–appellee, The Bank of New York  (entered on March 31, 2008), and (4) denying its motion for summary judgment and granting summary judgment to Interpleader Defendants–Appellees, First Millennium, Inc., Millennium Partners, L.P., and RMK Advantage Income Fund (entered on February 24, 2009).

AFFIRMED.

_____

SCOTT H. CHRISTENSEN, Hughes Hubbard & Reed LLP, Washington,

[*] At the time of oral argument, Judge Chin was United States District Judge for the Southern District of New York, sitting by designation.  The Honorable Rosemary S. Pooler, originally a member of this panel, did not participate in the consideration of this appeal. The two remaining members of the panel, who are in agreement, have determined the matter.  *See* 28 U.S.C. § 46(d); 2d Cir. I.O.P. E; *United States v. Desimone*, 140 F.3d 457 (2d Cir. 1998).

D.C. (George A. Davidson, Hughes Hubbard & Reed LLP, New York, NY and Colleen J. Boles, Lawrence H. Richmond, and Jaclyn C. Taner, Federal Deposit Insurance Corporation, Arlington, VA, *on the brief*) *for Interpleader Defendant-Counter Claimant-Appellant,* Federal Deposit Insurance Corporation, in its capacity as Receiver for NextBank, N.A.

MICHAEL E. JOHNSON (Judith A. Amorosa, *on the brief*), Alston & Bird LLP, New York, NY, *for Interpleader Plaintiff-Counter Claimant Defendant-Appellee*, The Bank of New York, in its capacity as Trustee for the NextCard Credit Card Master Note Trust.

MICHAEL J. EDELMAN (Michael G. Davies, *on the brief*), Vedder Price P.C., New York, NY, *for Interpleader Defendants–Appellees,* First Millennium, Inc. and Millennium Partners, L.P.

RONALD S. HERZOG (Michael Wexelbaum, Evangelos Michailidis, *on the brief*), Snow Becker Krauss P.C., New York, NY, *for Interpleader Defendant–Appellee,* RMK Advantage Income Fund.

———————

GERARD E. LYNCH, *Circuit Judge*:

In this interpleader action, the parties assert competing claims to the dregs of a failed securitization of credit card debt. Appellant, the Federal Deposit Insurance Corporation (the "FDIC"), as well as appellees, First Millennium, Inc., Millennium Partners, L.P. (together, "Millennium") and RMK Advantage Income Fund ("RMK"), seek distribution of the funds held by the interpleader plaintiff, the Bank of New York ("BNY"), as trustee for the NextCard Credit Card Master Note Trust ("the trust"). The FDIC argues that it is entitled to the funds as the receiver for NextBank, N.A., ("NextBank") a now-defunct internet-only bank, which established the trust in order to

3

generate money to lend to credit card holders. Millennium and RMK claim that they are entitled to the funds as owners of notes issued by the trust.

BNY initiated this interpleader action in New York state court. The FDIC removed it to the United States District Court for the Southern District of New York (Haight, *J.*). In a series of rulings, the district court denied the FDIC's motion to transfer the action to the United States District Court for the District of Columbia, enjoined BNY from making distributions from the interpleader funds, dismissed the FDIC's counterclaims against BNY, and, lastly, denied the FDIC's motion for summary judgment and granted summary judgment to Millennium and RMK. The district court then ordered BNY to begin distributing the trust corpus, giving preference to satisfying the claims of Millennium and RMK. The FDIC now appeals the decisions of the district court. We affirm.

## BACKGROUND

**I.      The Securitization Transaction**

In 1999, NextBank, an internet-only bank, began to issue consumer credit cards to sub-prime borrowers who applied over the internet. The business grew, and by February 2002, NextBank had 1.2 million cardholders. Rather than borrow money directly to lend to consumers, NextBank entered into a securitization transaction to generate funds. It established a trust at BNY and sold its credit card receivables – the rights to be paid interest and principal for purchases on the cards – to the trust, using the proceeds to

4

finance cardholders' purchases. BNY then issued notes backed by the cash flows generated from the receivables to investors. This transaction generated approximately $1.7 billion and provided funding for most of the credit cards issued by NextBank.

The trust issued two series of notes, the 2000-1 Series and the 2001-1 Series, which came due, respectively, in December 2006 and April 2007. These notes were issued in four classes (A, B, C and D), which paid different rates of interest and carried differing levels of risk. The class A notes were the least risky, since they carried the right to first repayment from the trust corpus. Accordingly, the class A notes paid the lowest rate of interest. The class B notes both carried more risk – since their holders had rights to repayment subordinate to the class A noteholders' – and paid a slightly higher rate of interest. The classes C and D notes were successively both riskier and higher paying. However, as protection for the holders of these riskier C and D notes, certain money from their initial purchase of the notes was set aside in a "spread account" to be used to fund interest and principal payments on the notes should the money generated by the receivables prove insufficient. Over the life of the trust, the amount of money in the spread account was adjusted on a regular basis according to a formula.

The securitization was executed through a set of documents that included a master indenture and various indenture supplements. As is customary, some terms of the noteholders' investments were also laid out on the notes themselves. Additionally, all

potential purchasers of the notes received copies of offering memoranda that described the terms of the notes and the risks associated with investing in them.

Under the transaction documents, the trust owned the credit card receivables. Cardholders' payments of fees and interest (or, as they are described in the deal documents, "finance charges") were used to make interest payments on the notes. Money not used to make interest payments was divided into two pots, labeled "collateral" and the "transferor interest." The collateral was intended for the eventual repayment of the principal of the notes (although during an initial "revolving period" it was used to fund new loans to credit card holders.) The transferor interest, on the other hand, was intended to fund regular payments to NextBank as the creator of the trust. The trust documents provided that at the termination of the trust, any money left over after all the trust's obligations had been satisfied in full was to be distributed to NextBank.

In the event that cardholders defaulted on their card payments, the defaulted amount was charged off against the assets in the trust labeled the "invested amount," which was defined as the sum of the collateral and the spread account. In effect, if cardholders failed to repay their loans, the reduction was accounted for in the trust by reducing the funds labeled collateral rather than those labeled transferor interest. This accounting provision proved significant when large numbers of the sub-prime borrowers with whom NextBank did business eventually defaulted.

6

## II. NextBank's Receivership

In 2001, the FDIC determined that NextBank's undercapitalization and practice of extending credit to subprime borrowers had endangered its ability to continue operating. In 2002, after the Comptroller of the Currency discovered that NextBank's accounting was improper, it appointed the FDIC as the bank's receiver. As receiver, the FDIC succeeded to "all [NextBank's] rights, titles, powers, and privileges," 12 U.S.C. § 1821(d)(2)(A)(I), while continuing to operate the bank. The FDIC allowed the credit card accounts to remain open while it sought a buyer for NextBank's assets. Eventually, however, when no buyer materialized, the FDIC closed the credit card accounts. The cardholders were then unable to make new charges on their cards, but remained responsible for paying off their balances.

Funds from the trust were distributed to the classes A and B noteholders, who were fully repaid the principal and interest due on their notes. Class C noteholders received partial repayment of the principal and interest owed to them. Class D noteholders received some interest payments, but their investment principal was not repaid. The FDIC continued to receive payments of transferor interest from the trust until such payments were stopped in connection with this interpleader action.

As things stand now, cardholders have defaulted on their loans in large number and charge-offs have reduced the collateral in the trust to zero. Furthermore, the funds in the spread account have now been distributed to the class C noteholders, by an order of

the district court not challenged in this appeal, with the result that the entire trust corpus consists of funds labeled "transferor interest." The present dispute concerns who is entitled to these funds as between the remaining unpaid noteholders and the FDIC, which as receiver for the trust's creator NextBank possesses both rights to regular payments of transferor interest and a residuary interest in any assets of the trust that remain after all the trust's other obligations have been satisfied.

**III.     The District of Columbia Litigation**

In June 2003, BNY filed suit against the FDIC in the United States District Court for the District of Columbia on behalf of the C and D noteholders, bringing six claims for conversion. One of BNY's claims was dismissed by the court early in the litigation, *see Bank of New York v. FDIC,* 453 F. Supp. 2d 82, 91 (D.D.C. 2006) ("*NextBank I*"), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007), and four other claims were dismissed pursuant to a settlement agreement that provided for the distribution of some trust assets to the FDIC.

The D.C. district court granted summary judgment to the FDIC on BNY's final claim, that the FDIC had unlawfully converted funds to which the noteholders were entitled by refusing to honor the so-called *ipso facto* clause of the master indenture. That term provided for accelerated repayment of principal to the noteholders in the event that NextBank was placed in receivership. The FDIC contended – and the court agreed – that it was entitled to disregard this provision under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"). 12 U.S.C. § 1821(e)(12)(A) (2004); *see*

8

*NextBank I* at 101.

Shortly thereafter, despite the District of Columbia district court's decision, certain noteholders demanded that BNY distribute the trust assets to them, citing, among other grounds, the *ipso facto* clause of the master indenture. In response to this claim, BNY ceased making regular distributions of the transferor interest to the FDIC and initiated the current interpleader action in New York state court. The FDIC removed the interpleader action to the United States District Court for the Southern District of New York. It also asserted a number of counterclaims against BNY, charging that BNY was liable for violating the transaction documents, the court's order in *NextBank I*, and the settlement agreement in that litigation, and for abuse of the judicial process.

The FDIC then filed a new suit in the D.C. district court, seeking, among other remedies, that the court enjoin the interpleader action from proceeding. The FDIC argued that the initiation of the S.D.N.Y. interpleader violated the orders of the court in *NextBank I*, as well as the settlement agreements executed in that action, and that BNY had converted its funds by ceasing distributions of transferor interest. *See FDIC v. Bank of New York*, 479 F. Supp. 2d 1 (D.D.C. 2007) ("*NextBank II*"). The D.C. court ruled that, to the degree that the noteholders pursued remedies on the basis of the *ipso facto* provision of the trust's master indenture, their action was collaterally estopped by *NextBank I*, since that decision had held that the clause was void and unenforceable. *Id.* at 18. The D.C. district court therefore enjoined BNY and the noteholders from

9

relitigating the issue of the *ipso facto* clause in the interpleader action. It also ordered BNY to continue to make distributions of transferor interest to the FDIC in accordance with the schedule in the trust documents, as well as to make back payments for those distributions that had been missed since BNY had suspended the payments. The court noted, however, that "the Noteholders appear to have raised an additional claim . . . based on the maturity date of the . . . notes[,] which they apparently claim is not dependent on the enforceability of [the *ipso facto* clause]. . . . To the extent that this alternative claim has been raised in the interpleader, it may present new issues and this Court may not enjoin future litigation regarding this claim." *Id*. at 20.

**IV.     The Southern District of New York Litigation**

After the D.C. district court issued its decision in *NextBank II*, the district court in the Southern District of New York lifted the stay on the interpleader action, which it had granted while that decision was pending, and issued an order clarifying that BNY was not precluded from complying with the orders of the D.C. district court in *NextBank II*. It then proceeded to deal with various motions made by the parties.

The court first ruled on the FDIC's motion to transfer venue for the interpleader action to the District of Columbia. The FDIC presented two separate arguments that venue was proper in D.C. rather than in the Southern District of New York: first, that FIRREA conferred exclusive jurisdiction on the DC district for claims against the FDIC, citing 12 U.S.C. § 1821(d)(6)(A), and second, that the action should be transferred in the

interest of justice because it was closely related to the previous litigation in D.C. The district court rejected both arguments. The court ruled that FIRREA did not govern the interpleader action, because it applied only to claims *against* the FDIC, and the interpleader properly represented a claim *by* the FDIC to the trust corpus. *See Bank of New York v. First Millennium, Inc.*, No. 06 Civ. 13388 (CSH), 2007 WL 1404433 (S.D.N.Y. May 9, 2007). The court also ruled that venue should not be transferred in the interest of justice, concluding that, since the issues involved in the interpleader action were distinct from the previously-adjudicated issues involving the *ipso facto* clause, fairness and convenience factors did not support the transfer. Furthermore, the court determined that the D.C district court lacked personal jurisdiction over Millennium and RMK, since those entities did not do business in the District of Columbia, and – because the New York and D.C. actions presented distinct issues – could not reasonably have anticipated being haled into court there simply by reason of their participation in the D.C. action. Accordingly, the court denied the FDIC's motion to transfer. The court then issued an order precluding BNY from making further distributions from the trust corpus without a further order from the court.

In its next opinion, the court addressed the noteholders' motion for immediate distribution of the funds in the spread account. Although the FDIC did not oppose the distribution, it contended that in order to receive the funds, the noteholders were obligated to surrender their notes and to disclaim any additional recovery from the interpleader.

11

The court construed the deal documents not to require that claimants surrender their notes in order to access the funds in the spread account, and ordered the immediate distribution of the spread account funds without imposing the condition. *See Bank of New York v. First Millennium, Inc.*, 544 F. Supp. 2d 253 (S.D.N.Y. 2008).

Shortly thereafter, the court issued an opinion dismissing the FDIC's counterclaims. *See Bank of New York v. First Millennium, Inc.*, No. 06 Civ. 13388 (CSH), 2008 WL 953619 (S.D.N.Y. Apr. 8, 2008). The district court found that since BNY faced competing claims to the trust assets from the noteholders and from the FDIC, it acted properly in commencing the interpleader action. It could not therefore be found liable for abusing the judicial process simply by virtue of initiating the interpleader. Since this was the sole basis for the FDIC's abuse of the judicial process counterclaim, the district court dismissed that claim. Additionally, the court concluded that all of the FDIC's other claims were ultimately based on the commencement and maintenance of the interpleader action, and therefore similarly failed as a matter of law.

Finally, the court issued an opinion resolving the rights to the remaining assets in the trust by disposing of cross-motions for summary judgment filed by the FDIC and by Millennium and RMK. *See Bank of New York v. First Millennium, Inc.*, 598 F. Supp. 2d 550 (S.D.N.Y. 2009). The noteholders argued that they were entitled to the remaining trust assets, since their notes had reached final maturity and were now due and payable, and since the unpaid principal on the notes was greater than the remaining assets in the

12

trust. The FDIC, on the other hand, made two separate arguments that it was entitled to the remaining trust assets. First, it argued that, according to the deal documents, the charge-offs against the collateral made when cardholders had stopped repaying their loans had reduced to zero not only the collateral in the trust, but also the amount of unpaid principal due to the noteholders. Accordingly, it contended, the noteholders had no valid claim to any of the trust assets. Second, it argued that the issuer's obligation to pay principal and interest on the notes was limited by recourse only to the collateral and the spread account. Accordingly, it argued, since the funds in the spread account had been disbursed and the collateral had been reduced to zero, the trust had no obligation to distribute any assets to the noteholders.

The district court interpreted the deal documents as a contract under New York law. First, on the basis of what it determined to be the unambiguous language of the contract, it rejected the FDIC's claim that charge-offs reduced the principal amount repayable to the noteholders upon the maturity of their notes. Second, the court concluded that the deal documents were inconsistent as to whether the notes were full or limited recourse obligations. On the one hand, a provision of the master indenture indicated that the notes were limited recourse, and therefore that their holders were entitled to repayment only from trust assets considered collateral. On the other hand, another provision of the master indenture provided that "notwithstanding any other provision," the trust's obligation to pay interest and principal on the notes was "absolute

13

and unconditional." The court determined that this "notwithstanding clause," which was similar to language on the C class notes themselves, trumped the limited recourse provision of the indenture. Accordingly, the court granted summary judgment to Millennium and RMK.

The court entered final judgment reflecting its earlier rulings. This appeal followed.

## DISCUSSION

In this appeal, the FDIC argues primarily that the district court misconstrued the noteholders' rights under the transaction documents, and therefore erred in granting summary judgment to Millennium and RMK. The agency claims both that by the time of the interpleader, no amount was due and payable on the notes, and also that even if there were an amount due on the notes, the noteholders may not collect it from the trust's remaining assets, which are labeled "transferor interest" in the deal documents, since the notes were limited in recourse only to trust assets labeled "collateral" or in the "spread account." The FDIC argues that since only funds labeled "transferor interest" are left in the trust, it should be able to terminate the trust and appropriate its remaining assets.

The FDIC also asserts that the district court erred in three other respects. First, it argues that before BNY initiated the interpleader action, the D.C. litigation had already conclusively determined that only the FDIC had a valid claim on the trust assets. Accordingly, it contends, all of the noteholders' claims were barred by claim and issue

14

preclusion and the district court should have dismissed the action. Second, the agency argues that the district court erred in denying the FDIC's motion to transfer the action to the District of Columbia, and that, since this decision was determinative of the outcome of the lawsuit, reversal of the district court's final order is warranted. Third, the FDIC appeals the dismissal of its counterclaims against BNY.

## I. The Summary Judgment Decision

The FDIC's primary argument on appeal is that the district court erred in granting summary judgment to Millennium and RMK because it misconstrued the nature of the deal between the noteholders and the trust. The FDIC argues that, according to the deal documents, the amount due on the notes was reduced to zero by charge-offs when cardholders defaulted on their payments. The FDIC additionally argues that the notes were defined in the master indenture as limited recourse obligations – meaning that even if principal were payable on the notes, the noteholders would be entitled to repayment only from the trust funds set aside as collateral. Since there is no collateral left, the FDIC asserts, the agency is entitled to terminate the trust and claim its remaining assets.

We review a grant of summary judgment *de novo*. *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

15

The parties agree that the transaction documents constitute a contract governed by New York law. Under New York law, the key inquiry at the initial stage of interpreting a contract is whether it is ambiguous with respect to the issue disputed by the parties. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010). "An ambiguity exists where the . . . contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Morgan Stanley Group Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks omitted). Summary judgment is generally inappropriate where the contested contractual language is ambiguous. *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006). We review *de novo* both whether a contract is ambiguous, *id.*, and, when the district court finds a contract unambiguous, its interpretation of the contract, *ReliaStar Life Ins. Co. of N.Y. v. Home Depot*, 570 F.3d 513, 517 (2d Cir. 2009).

A. *The Amount Due on the Notes*

The class C and class D notes state: "The entire unpaid principal amount of this [] Note shall be due and payable" at the note's maturity. Despite this clear language, the FDIC contends that the noteholders are due payment only of the "invested amount," a term defined in the master indenture as the unpaid principal amount, minus charge-offs on account of cardholders' defaults. If the FDIC's interpretation of the contract were

16

correct, there would be no amount due on the notes, since by the time the notes became due, this "invested amount" was zero.

The FDIC, however, has adduced no evidence to support its contention that the amount due on the notes at their maturity is this "invested amount" rather than the unpaid principal amount. The FDIC relies on language in the master indenture, providing that "in the event of default . . . the Indenture Trustee may . . . cause the Issuer to sell Principal Receivables in an amount equal to the Invested Amount." Even read in isolation, this is not a clear statement that noteholders are entitled only to repayment of the Invested Amount in the event of default. But the FDIC fails to mention that the issuer's power to sell the receivables in the event of default under this provision is expressly made conditional either upon the noteholders' consent or upon the trustee's determination "that any proceeds of such exercise distributable to the Noteholders of the affected series are sufficient to discharge in full all amounts then due and unpaid upon the Notes for principal and interest." Read in its context, this provision does not reinforce, but rather contradicts, the FDIC's assertion that the amount due on the notes is the invested amount rather than the entire unpaid principal.[1]

---

[1] The FDIC also invokes language in the offering memoranda that essentially reproduces this provision of the master indenture. This language does not directly state that charge-offs on the basis of cardholder default reduced the amount payable on the notes, and must be analyzed in the same way as the provision of the indenture itself discussed in the text above.

In light of the FDIC's failure to identify any provision of the deal documents that supports its contention that the amount due on the notes is anything other than the unpaid principal amount, and in light of the clear language to the contrary on the notes themselves, the district court was right to conclude that the contract unambiguously provides for the full repayment of the entire unpaid principal amount at the notes' maturity.

B. *The Recourse Nature of the Notes*

The FDIC's argument that the district court misconstrued the extent of trust assets subject to the noteholders' claims for repayment has more traction, but ultimately must also be rejected. The FDIC claims that the "limited recourse provision" of the master indenture limits the funds that the noteholders can pursue for repayment of their notes to those set aside as collateral. The FDIC contends that since – as all parties agree – no funds labeled "collateral" remain in the trust, the district court was wrong to conclude that the noteholders had any valid claim on the trust assets and therefore erred in granting them summary judgment.

The FDIC relies on the limited recourse provision of the master indenture, a prefatory provision of the document which reads:[2]

---

[2] The FDIC also contends that another provision of the deal documents limits the noteholders' recourse to the funds labeled collateral: the statement on the reverse of the notes that each noteholder "covenants and agrees that no recourse may be taken, directly or indirectly . . . against . . . any owner of a beneficial interest in the Issuer." The FDIC,

> The obligation of the Issuer to make payments of principal of, and interest on and other amounts with respect to, the Notes is limited by recourse only to the Collateral.

The FDIC contends that this provision strictly limits the noteholders' rights in the event of default to those assets accounted as "collateral."

The limited recourse provision, however, is not the only provision of the transaction documents that concerns the recourse nature of the notes. Two other provisions also govern the noteholders' rights to repayment in the event of default. First, the trust indenture contains a provision (the "notwithstanding clause") that reads:

> Notwithstanding any other provision in this Indenture, each Holder of a Note shall have the right which is absolute and unconditional to receive payment of the principal and interest in respect of such note as such principal and interest becomes due and payable and to institute suit for the enforcement of any such payment.

In addition, the class C notes (although not the class D notes) state

> No reference herein to the Indenture and no provision of this Class C Note or of the Indenture shall alter or impair the obligation of the Issuer, which is absolute and unconditional, to pay the principal of and interest on this Class C note at the times, place, and rate, and in the coin or currency prescribed.

These two provisions provide to holders of the notes "absolute and unconditional" rights to repayment, rights which cannot be limited to funds labeled "collateral" in the

---

however, misconstrues this provision, which does not limit the noteholders' recourse to particular trust assets but rather prevents the noteholders from seeking to have their notes repaid with non-trust assets held by other parties.

transaction documents. *See Hibbs v. Brown,* 82 N.E. 1108, 1110 (N.Y. 1907) ("an order or promise to pay out of a particular fund is not unconditional") (quoting The Negotiable Instruments Law § 22 (1897)).

The district court concluded that the trust indenture is inconsistent in how it describes the recourse nature of the notes, and, relying on *International Multifoods Corp. v. Commercial Union Insurance Co.*, 309 F.3d 76 (2d Cir. 2002), resolved this inconsistency by determining that the notwithstanding clause's plain language trumped the conflicting limited recourse provision.[3] The FDIC contends that the district court erred because there is no conflict between these "absolute and unconditional" rights to repayment and the limited recourse provision of the indenture.

The FDIC presents two convoluted theories as to why the notwithstanding clause does not conflict with the limited recourse provision. The FDIC's first argument hinges

---

[3] The district court also concluded that the inconsistency between the notwithstanding clause and the limited recourse provision of the master indenture was intended by the parties to make the class C notes full recourse obligations, while conferring limited recourse status on the class D notes, which lacked an "absolute and unconditional" guaranty of payment. The district court found that by accepting notes lacking this guaranty, the class D noteholders implicitly consented to the limited recourse provision of the indenture. This understanding of the agreement between the parties accounts both for the inclusion of the indenture's limited recourse provision and also for the striking economic difference between the class D notes, which paid the London Interbank Offered Rate (LIBOR) plus 6.35% or 6.5% (depending on the series), and the class C notes, which paid only LIBOR plus 1.60% or 1.65%. We need not address the district court's conclusion that the class D notes were limited recourse obligations, since this determination was not appealed. *See Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir. 2005); Fed. R. App. P. 28(a).

20

on the phrasing of the notwithstanding clause, which says that the repayment right is "in respect of such note as such principal and interest becomes due and payable." The FDIC argues that because the amount "due and payable" is limited by the limited recourse provision to the amount of the collateral, no conflict exists between the notwithstanding clause and the limited recourse provision.

This argument is without merit. The class C and D notes plainly say that "[t]he entire unpaid principal amount . . . shall be due and payable" at the notes' maturities. The limited recourse provision does not purport to alter this, pertaining only to which assets noteholders can access for repayment, and the FDIC fails to identify any other provision of the transaction documents that supports its contentions that the amount due on the notes is anything other than their entire unpaid principal. *See supra*, Section I(a). Accordingly, the district court did not err in rejecting this argument.

The FDIC also argues that the notwithstanding clause does not conflict with the limited recourse clause because it is "boilerplate" included in the transaction documents solely on account of the Trust Indenture Act of 1939 (the "TIA"). The FDIC observes that the language of the notwithstanding clause is similar to Section 316(b) of the TIA, 15 U.S.C. § 77ppp(b), a statutory provision requiring that bond indentures protect minority bondholders by prohibiting majority bondholders from collusively agreeing to modify the bond's payment terms. Since the language of the indenture provision is modeled on the provision of the TIA, the FDIC argues, this Court should interpret both to have the same

21

purpose. The FDIC urges us, therefore, to view this provision of the indenture as included by the parties "for the limited purpose" of preventing oppression of minority noteholders at the hands of majority noteholders, and to find that it has no applicability to the current dispute.

We decline to disregard the plain language of the indenture provision on account of its similarity to a provision of the TIA. Absent a finding that the transaction documents are ambiguous – which the FDIC does not contend – extrinsic evidence concerning the purpose behind contract provisions is not admissible. *Innophos, Inc. v. Rhodia*, *S.A.*, 852 N.Y.S. 2d 820, 823 (2008). Even if we were to consider the similarity between the notwithstanding clause and Section 316(b) of the TIA as evidence for why the parties included the clause in the indenture, that evidence would not compel us to limit the applicability of the clause to inter-noteholder disputes. While complying with Section 316(b) may have been one reason the drafters included the notwithstanding clause, it could not have been the only reason. Nothing in Section 316(b), or the TIA in general, requires that bondholders be afforded "absolute and unconditional" rights to payment, the precise term that the FDIC seeks to have us disregard. The "absolute and unconditional" right to repayment – a right that expressly conflicts with the limited recourse provision of the indenture – has no obvious relation to the purpose of preventing the oppression of minority bondholders. We cannot read that right out of the contract because it is embedded in a provision that arguably was included for another reason.

22

Having rejected the FDIC's arguments that the notwithstanding clause and the limited recourse provision of the master indenture can be reconciled, our prior cases applying New York law provide clear direction on the proper way to resolve the inconsistency. This Court has recognized many times that under New York law, clauses similar to the phrase "[n]otwithstanding any other provision" trump conflicting contract terms. *See Int'l Multifoods,* 309 F.3d at 90-91; *L&B 57th St., Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88, 93 (2d Cir. 1998); *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 438-39 (2d Cir. 1995). By its plain terms, the "absolute and unconditional" right to repayment granted to the noteholders by the indenture overrides the conflicting limited recourse provision, and allows the noteholders to seek repayment from all the assets of the trust.

We note, moreover, that the FDIC does not seriously address the conflict between the limited recourse provision of the indenture and the "absolute and unconditional" right to payment on the reverse of the class C notes, saying only that since the notes say that they are "subject to all the terms of the Indenture," the limited recourse provision applies. Of course, the class C notes explicitly state that the repayment right supercedes both the terms of the indenture and all other provisions of the note. Furthermore, New York law is clear that where there is a conflict between the terms of the note and ancillary documents, the terms of the note control. *Cunningham v. Pressed Steel Car Co.*, 265 N.Y.S. 256, 259-60 (1st Dep't 1933), *aff'd*, 189 N.E. 750 (N.Y. 1934) ("[A]ny inconsistency between

23

the bond and the indenture must be construed in favor of the bondholder.").  This language on the class C notes – never fully confronted by the FDIC in its attempts to construe the transaction documents as consistently representing the notes as limited recourse – further strengthens our conviction that the parties intended the notes to be full recourse obligations of the issuer.

Accordingly, the district court did not err in determining that the class C notes were full recourse obligations of the issuer and granting summary judgment to the noteholders on that basis.

**II.    Issue and Claim Preclusion**

The FDIC also contends that this interpleader action is an attempted end run around the judgment of D.C. district court, which it claims unequivocally awarded all the remaining trust assets to it as the receiver for NextBank.  The FDIC argues that *NextBank I* and *NextBank II* determined that the FDIC owned the transferor interest, and that this determination is binding under the doctrine of claim preclusion on Millennium and RMK as parties in privity with BNY.  Furthermore, it argues that the doctrine of issue preclusion bars the noteholders' claims, because all of the issues raised in the interpleader action were actually litigated, fully and fairly, in the D.C. litigation.  These contentions are unpersuasive.

"The doctrine of . . . claim preclusion[] holds that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could

24

have been raised in that action." *Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 284 (2d Cir. 2000) (internal quotation marks omitted). Otherwise known as *res judicata*, claim preclusion bars a subsequent action – involving either the same plaintiffs or parties in privity with those plaintiffs – from asserting claims that were, or could have been, raised in a prior action that resulted in an adjudication on the merits. *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

In contrast, issue preclusion, also known as collateral estoppel, bars a plaintiff from relitigating an *issue* that has already been fully and fairly litigated in a prior proceeding. *Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003). Issue preclusion apples when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Ball v. A. O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks omitted).

We review the district court's application of the principles of claim and issue preclusion *de novo*. *Chartier v. Marlin Mgmt., LLC*, 202 F.3d 89, 93 (2d Cir. 2000).

*NextBank I* actually and necessarily determined that the early amortization clause of the master indenture was unenforceable against the FDIC. Issue preclusion, therefore, did bar one of Millennium's and RMK's claims in the interpleader action: their claim on the basis of the early amortization provision of the master indenture. For this reason, the

25

noteholders' claim on the basis of that particular clause was barred from relitigation by the doctrine of issue preclusion, as the D.C. district court's opinion in *NextBank II* recognized. *NextBank II,* at 17. The district court below recognized the correctness of this ruling and did not reconsider that issue.

The FDIC's argument that the *entire* interpleader action is barred by issue preclusion on account of the D.C. litigation, however, is without merit. The *ipso facto* clause claim was only one of the two claims to the trust assets asserted by the noteholders in the Southern District action. By the time the noteholders filed their answers in the interpleader action, their notes had become due and payable. Accordingly, in addition to their claims under the *ipso facto* clause, they also asserted in the present action that BNY was obligated to distribute to them the trust assets as repayment of the principal due on their notes.

Contrary to the FDIC's contention, this issue was not addressed by the D.C. court. At the time of the D.C. litigation, the notes had not yet matured. Accordingly, the D.C. court did not consider whether the notes were full recourse or limited recourse obligations of the issuer, since that distinction matters when notes are due and payable. Because the noteholders' claims on the basis of the notes' maturity were not at issue in the earlier litigation, the subsequent litigation of this issue in the interpleader was not precluded. The D.C. court itself reached this very conclusion in *NextBank II*, refusing to enjoin the noteholders' litigation in the Southern District of claims on the basis of the notes'

26

maturity, since *NextBank I* had not considered maturity-based claims. *NextBank II*, at 20.

The FDIC's defense of claim preclusion is likewise without merit. Claim preclusion bars the relitigation only of claims that were, *or could have been*, brought in an earlier litigation between the same parties or their privies. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195-96 (2d Cir. 2010). It has no effect on claims that *could not have been* brought in the prior action. The first of the class C notes came due in December 2006. Accordingly, the noteholders could not have raised their claims on the basis of the notes' final maturity in the NextBank I action, which began in 2003, nor as a counterclaim in NextBank II, which began in November 2006. Claim preclusion does not bar claims, even between identical parties, that arise after the commencement of the prior action. *See Storey v. Cello Holdings, LLC,* 347 F.3d 370, 383 (2d Cir. 2003) ("Claims arising subsequent to a prior action need not, and often perhaps could not, have been brought in that prior action; accordingly, they are not barred by *res judicata*."). Accordingly, the claims in this interpleader action were not precluded by the earlier litigation.

**III.    Denial of the Transfer Motion**

The FDIC also contends that the district court abused its discretion by denying its motion to transfer the interpleader action to the D.C district court. The FDIC cites two separate reasons why the action should have been transferred. First, it argues that FIRREA dictates that all actions involving the FDIC be brought either in the District of

27

Columbia or in the district where the institution in receivership is headquartered, in this case the District of Arizona. Second, the FDIC argues that the district court should have transferred the action "in the interest of justice," because related actions had previously been brought in D.C.

The FDIC's first argument is based on FIRREA. The agency claims that 12 U.S.C. §§ 1821(d)(6)(A)(ii) and 1821(d)(13)(D)(ii) limit the interpleader action to two venues, the District of Columbia and the District of Arizona, the location of NextBank's headquarters. Although cast as an argument that the district court abused its discretion in denying its motion to transfer the venue of the action to the District of Columbia, *see Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.,* 865 F.2d 513, 520 (2d Cir. 1989), the FDIC's contention that FIRREA necessitated bringing the interpleader in either D.C. or Arizona is actually an argument that the interpleader action was improperly venued in the Southern District of New York as a matter of law, or even that the New York court lacked subject matter jurisdiction, *see Carlyle Towers Condominium Ass'n, Inc. v. FDIC,* 170 F.3d 301 (2d Cir. 1999) (treating an argument under 12 U.S.C. § 1821(d)(13)(D) as a claim that the district court lacked subject matter jurisdiction). We review the district court's legal conclusions concerning subject matter jurisdiction or venue *de novo. Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (subject matter jurisdiction); *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir. 2005) (venue).

28

No matter how the FDIC's argument is categorized, it is without merit. 12 U.S.C. § 1821(d), among other things, establishes administrative procedures for bringing claims against institutions for which the FDIC is receiver. *See Vill. of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 385 (6th Cir. 2008). Within this context § 1821(d)(6)(A)(ii), on which the FDIC relies, provides

> the claimant may request administrative review of the claim
> . . . in the district or territorial court of the United States for
> the district within which the depository institution's principal
> place of business is located or the United States District Court
> for the District of Columbia (and such court shall have
> jurisdiction to hear such claim).

This provision concerns judicial review of claims brought under the administrative procedures of § 1821(d). Such administrative claims may only be reviewed by federal courts in the District of Columbia and in the district where the entity in receivership was headquartered.

This interpleader, however, is not an administrative claim, nor could it have been one. The noteholders are not creditors of NextBank, and they assert no claims against either that failed institution or against the FDIC. They hold notes issued by the trust, an independent and still solvent entity. Accordingly, since they assert no claims against the FDIC as receiver for NextBank, they are not bound by the jurisdictional limitations or other procedural requirements of the § 1821(d).

While the plain language of the other provision on which the FDIC relies,

29

§ 1821(d)(13)(D)(ii), may initially appear helpful to the FDIC's argument, closer examination reveals it to be irrelevant. Section 1821(d)(13)(D)(ii) states: "[e]xcept as otherwise provided in this subsection, no court shall have jurisdiction over . . . any claim relating to any act or omission of [an] institution [in receivership] or the Corporation as receiver." Read out of context, this provision may seem to deprive courts of jurisdiction over any claim involving the FDIC's "act or omission," even a claim not directly against the FDIC. Such an interpretation would be erroneous. This provision is not an isolated edict, but is part of FIRREA's statutory scheme, which was intended to force plaintiffs with claims against failed depository institutions to exhaust administrative remedies before coming to federal court. *Carlyle Towers*, 170 F.3d at 307. Courts interpreting the broad language of § 1821(d)(13)(D)(ii) have universally concluded that this provision bars only claims that could be brought under the administrative procedures of § 1821(d), not any claim at all involving the FDIC. *See Auction Co. of Am. v. FDIC,* 141 F.3d 1198, 1201 (D.C. Cir. 1998) (holding that § 1821(d)(13)(D)(ii) grants the FDIC immunity only from claims that can be brought through the administrative processes of § 1821(d)); *Hudson United Bank v. Chase Manhattan Bank of Connecticut, N.A.*, 43 F.3d 843, 849 (3d Cir. 1994) ("The purpose [of FIRREA] was not to immunize certain claims from review."). We agree with their conclusion. Accordingly, since the noteholders assert no claim against either the FDIC or NextBank, and since they are not compelled to comply with the administrative procedures of § 1821(d), § 1821(d)(13)(D)(ii) neither bars their

30

claims nor forces them to bring the claims in a different court. FIRREA, therefore, did not deprive the district court of subject matter jurisdiction over the interpleader action nor did it render the Southern District of New York an improper venue, and the district court did not err in refusing to transfer the motion to D.C. on this basis.

The FDIC's other arguments that D.C. was a more appropriate venue for the interpleader than the Southern District of New York are similarly unavailing. We review a decision granting or denying a motion to transfer venue for convenience of the parties for abuse of discretion. *See Filmline*, 865 F.2d at 520. Where the district court bases its decision on a conclusion concerning personal jurisdiction, the legal conclusion is subject to plenary review. *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 179 (2d Cir. 2000). However, as *SongByrd* makes clear, the standard of review for a decision granting or denying transfer is distinct from the showing that has to be made in order for us to reverse a transfer ruling by a district court after final judgment has been rendered. *Id.* To obtain a reversal of an order denying a motion to transfer, the appealing party must "show that a different result would have been reached had the suit been transferred." *Filmline*, 865 F.2d at 520 (internal quotation marks omitted).

In this case, the FDIC has made no such showing. The agency's only argument that the outcome of the interpleader action would have been different if it had been conducted in D.C. is that the D.C. court would have recognized that its earlier rulings precluded the Southern District litigation. Since the FDIC's arguments for issue and

31

claim preclusion are meritless, we cannot assume that the D.C. district court would have erroneously accepted them. In any event, the FDIC's arguments for issue and claim preclusion *were* presented to the D.C. court, which largely rejected them in *NextBank II*. Accordingly, the FDIC has presented no rationale for reversing the district court's denial of its motion to transfer the interpleader action to D.C., and we need not further consider its arguments that D.C. would have been a preferable district for bringing this interpleader action.

**IV.    The Dismissal of the FDIC's Counterclaims**

As a parting shot, the FDIC contends that the district court erred in dismissing its counterclaims for breach of contract and for abuse of judicial process by granting BNY judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The FDIC asserts that BNY breached the transaction documents, and violated the orders of the D.C. district court in *NextBank I,* when it ceased monthly payments to the FDIC and instituted an interpleader action. The FDIC acknowledges that at the time that BNY instituted the interpleader action, it faced claims on the trust corpus from the noteholders that competed with its own claim to regular payments of the transferor interest. The agency argues, however, that because the transaction documents allowed BNY to refuse demands for payment that were "in conflict with any rule of law or with [the] Indenture," BNY acted wrongfully in instituting the interpleader action. The FDIC further claims that BNY abused the judicial process by instituting the interpleader as "an excuse" to stop payments

32

to the FDIC.  Lastly, the FDIC argues that it should be awarded attorneys' fees for its expenses in this litigation because it was duplicative and brought improperly, citing *Ingersoll Milling Machine Co. v. M/V Bodena*, 829 F.2d 293, 309 (2d Cir. 1987).

We review a judgment on the pleadings *de novo*.  *See Hardy v. N.Y. City Health & Hosps. Corp.*, 164 F.3d 789, 792 (2d Cir. 1999).  The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings.  *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).  "Thus, we will accept all factual allegations in the complaint as true and draw all reasonable inferences" in favor of the counter-claimant.  *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (internal quotation marks omitted).  To survive a Rule 12(c) motion, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id*. (internal quotation marks omitted).

BNY commenced the interpleader under New York law, which permits "a person who is or may be exposed to multiple liability as the result of adverse claims" to "commence an action of interpleader against two or more" persons who have "made or may be expected to make an [adverse] claim."  N.Y. Civ. Prac. L. & R. § 1006(a) (McKinney 1997).  The interpleader plaintiff is not required to assess the legal validity of the competing claims against it; interpleader is proper so long as the party requesting it has "real or reasonable fear of double liability or vexatious, conflicting claims."  *Washington Elec. Coop., Inc. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993)

33

(internal quotation marks omitted).

Given that the noteholders had not simply a plausible but, in fact, a valid claim on the trust assets, the FDIC's contention that BNY did not genuinely face adverse claims on the trust corpus given its right under the indenture to ignore the noteholders' demands is obviously without merit. Accordingly, the FDIC does not state a valid claim for abuse of the judicial process against BNY. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Clemente*, No. 98 Civ. 1756, 2001 WL 11070, at *6 (S.D.N.Y. Jan. 4, 2001) ("[C]ounterclaims [that] arise from acts taken [by an interpleader plaintiff] within the rights granted to it by law in bringing its interpleader action . . . fail as a matter of law.") (brackets and internal quotation marks omitted). Furthermore, since we find that the noteholders were entitled to the trust assets under the transaction documents and that this finding does not conflict with the previous orders of the D.C. court, the FDIC's breach of contract counterclaims, and its arguments that the noteholders violated the orders of the D.C. court in bringing this action, fail as a matter of law. Finally, since the interpleader action was neither duplicative nor improper, there is no reason for us to order BNY to reimburse the FDIC for its attorneys' fees.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is AFFIRMED.

34